**David TALEVICH and Samuel Edward Dorgan, on their own behalf and on behalf of all those similarly situated, Plaintiffs,**

v.

**Henry J. VOSS, Director, California Department of Food and Agriculture, in his official capacity, Defendant.**

**No. SA CV 90–92 AHS (RWRx).**

United States District Court,
C.D. California.

April 10, 1990.

Robert J. Cohen, Crystal C. Sims and Harry W. Simon, Legal Aid Soc. of Orange County, Santa Ana, Cal., for plaintiffs.

Charles W. Getz, IV, Deputy Atty. Gen., San Francisco, Cal., for defendant.

## ORDER DENYING PRELIMINARY INJUNCTION

STOTLER, District Judge.

### I.

### BACKGROUND

On January 25, February 15, and March 8, 1990, the State of California sprayed

Malathion insecticide from helicopters over portions of Garden Grove and other Orange County cities. On February 13, 1990, plaintiffs filed a complaint for injunctive relief and sought an immediate restraining order. After a brief hearing, the Court denied their application, questioning the Court's jurisdiction as to the relief prayed for under the Eleventh Amendment to the Federal Constitution.

At a hearing on March 6, 1990 on the Order to Show Cause why a Preliminary Injunction should not issue, the Court concluded that injunctive relief was not beyond its jurisdiction, but found that plaintiffs had not demonstrated a constitutional deprivation. By this Order, the Court denies the Preliminary Injunction and directs entry in part of the Findings of Fact and Conclusions of Law proposed by defendant.

## II.

### FACTS

The Mediterranean fruitfly (the "Medfly") is a pest not native to California, currently infesting approximately 372 square miles of Los Angeles and Orange Counties. The pest poses a severe threat to the economy and welfare of the State of California and can infest over 200 varieties of fruit. California and the County of Orange have declared states of emergency under California law as a result of this infestation, as has the U.S. Department of Agriculture. Getz Declaration, pp. 42–43. The State is currently engaged in an Emergency Eradication Project, pursuant to Cal.Food & Agric.Code §§ 5761–5763, under the authority of the Governor and the State Emergency Services Act in an attempt to eliminate the Medfly infestation. Complaint, Exhibit 2, p. 16.

The pesticide Malathion has been approved by the Environmental Protection Agency ("EPA") for use in the declared emergency in California. The authorization is in the form of a special quarantine exemption for emergency conditions to control the introduction or spread of a pest new to an area, under Section 18 of Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136p; 40 C.F.R. § 166.2(b).

Complaint, Exhibit 3. The exemption authorizes applications of a maximum of 2.8 ounces of Malathion per acre mixed with a maximum of 9.6 ounces of Staley's Protein bait or similar bait material, and allows application by ground spray equipment or by aircraft in agricultural and urban areas.

The California Department of Food and Agriculture ("CDFA") convened a Science Advisory Panel made up of recognized experts on the Medfly to advise Voss, director of the CDFA, and the CDFA on the feasibility of eradicating the Medfly, as well as the best methods to accomplish eradication. The Science Advisory Panel reported that eradication is feasible, and recommended two methods to be used for eradication: (1) 1 to 3 aerial applications of the Malathion bait followed by massive releases of 100 sterile Medflies to every 1 wild male Medfly found in traps; or (2) repeated applications of Malathion bait. Getz Declaration, Siddiqui Declaration, p. 23.

The Science Advisory Panel recommended limited applications combined with the release of sterile Medflies. That approach appears to be the State's preference as well. Getz Declaration, Siddiqui Declaration, p. 23. However, the State has been unable to procure an adequate source of high quality sterile Medflies. *Id.* In December 1989, the Science Advisory Panel recommended that new infestations be treated by repeated aerial applications. The State has therefore undertaken repeated aerial applications. Complaint, Exhibit 2, p. 16.

The State, through the CDFA, is aerially applying a Malathion bait consisting of approximately 2.8 ounces of Malathion mixed with 9.6 ounces of Staley's Protein bait over infested areas of Los Angeles and Orange County. The applications in Orange County commenced on January 25, 1990 and are scheduled to be repeated on a 21–day interval until the Medfly has been eradicated. The Malathion bait is applied during the night from low-flying helicopters. The bait material is a sticky substance in droplet form which attracts the

Medfly. When the Medfly ingests the bait, it ingests the pesticide and is killed. California has devised a procedure to be followed in the event a challenge to the spraying is pursued in the courts. Cal.Civ.Pro. Code § 1085.5 and Cal.Food & Agric.Code §§ 5051 *et seq.*

The estimated cost of the eradication program in Los Angeles, Orange and San Bernardino Counties is approximately $27 million. However, the estimated cost of the potential damage of a Medfly infestation is $200 million per year. Getz Declaration, Siddiqui Declaration, p. 23.

The EPA's special quarantine exemption indicates that prior to the initiation of the program, notification should be made through public media, and individual property owners should be contacted and advised of the treatment and appropriate precautions. Complaint, Exhibit 3, p. 21. Notice of the initial aerial application was provided to each residence in the spray area, local motels, and was posted in Pioneer Park in the City of Garden Grove, a place where the homeless are known to congregate. Getz Declaration, Siddiqui Declaration, p. 25; Zadig Declaration, p. 3. Approximately 122,200 notifications were distributed for the January 20, 1990 spraying. Getz Declaration, Henry Declaration, p. 18.

The notice states that Malathion poses no danger and that its toxicity is approximately the same as laundry detergent. Complaint, Exhibit 1. It further states that there is no need to leave the area during a spray, but that, if convenient, people might prefer to stay indoors in order to avoid any spotting of apparel. *Id.* The notice recommends normal washing with soap and water if the bait mixture gets on clothing. *Id.*

Plaintiffs claim they are persons without homes who were located in the Northwestern portion of the City of Garden Grove, County of Orange, on the night of January 25, 1990. Starting at 9:00 p.m., helicopters aerially applied the Malathion bait pursuant to the Emergency Eradication Project.

Plaintiffs allege that immediately subsequent to the spraying, they and other persons in the vicinity exposed to the spray experienced flu-like symptoms, including chills, nausea, vomiting, diarrhea, fatigue, loss of appetite, watering eyes, and shortness of breath. Declarations in Support, Exhibits 1, 2, 4–13, 16. These are said to be symptoms consistent with Malathion poisoning. Declarations in Support, Exhibit 17. Many of the homeless and others admit to seeing the notice of the spraying posted in Pioneer Park or in other locations. However, for various reasons, they went outside during the spray. Declarations of Support, Exhibits 1, 4–6, 10, 13.

Many homeless individuals submitted declarations to the effect that their bedding and clothes had a "sticky goopy" substance on them as a result of the Malathion bait. Declarations in Support, Exhibits 11, 13–15. They allege that it was difficult to get a change of clothes or bedding to replace what was soiled by the Malathion bait, and that they were not able to wash their bedding or change their clothes until some days after the spray. *Id.*

Plaintiffs suffer a wide variety of adverse conditions as a result of their homelessness. It happens that the current program of spraying of Malathion adds to their many problems. While residents may stay inside their homes during the aerial applications, the homeless have a much greater chance of coming into physical contact with the spray. In addition, they may be exposed to and breathe the spray residues overnight if they sleep in the street.

Residents in general have better access to the news media to receive notice of the date and time of an intended spraying. While several declarants who support the application for injunction knew of the intended spraying, it is no doubt true that the first notice many homeless individuals receive is the sound of the low-flying helicopters and perhaps the Malathion spray droplets falling on them. Furthermore, the homeless often have no place to wash themselves or their clothes with soap and water, and may not be able to change their clothes for some period of time after an application. Accordingly, the sticky bait material may remain on their clothing for

days before they get a chance to change their clothes or wash.

State Senator Marian Bergeson drew the problem of the homeless to the attention of Governor Deukmejian in a letter dated January 19, 1990. Complaint, Exhibit 5, p. 27. She noted that "although it is still unclear whether or not this chemical presents a health hazard to our citizens, it is clear that it presents a hygiene problem for the homeless." Senator Bergeson requested the Governor to use the Cold Weather Armory Program to provide shelter to the homeless during the aerial applications of Malathion bait. The Cold Weather Armory Program is a program whereby the State provides shelter to the homeless in the National Guard armories and transportation thereto during nights of extremely cold weather or rain. Declarations in Support, Exhibit 20, pp. 62–63.[1]

### III.

### SUMMARY OF PROCEEDINGS

On February 13, 1990, plaintiffs filed their complaint. That same date, plaintiffs filed an *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction, together with supporting declarations of various homeless individuals who allegedly suffered the flu-like symptoms. Defendant filed opposition and supporting declarations.

In order to protect plaintiffs' claimed liberty and property interests, the right to be free from injury inflicted by contact with the Malathion spray and the right to not have their belongings soiled by the same source, plaintiffs seek to enjoin defendant from continuing to spray the Malathion bait unless and until a plan is implemented to give the homeless adequate notice and protect them from the spray. Several forms of relief were outlined in plaintiffs' proposed order.

As indicated, plaintiffs' Application for Temporary Restraining Order was denied. The Court scheduled a hearing on the Order to Show Cause re Preliminary Injunction for February 27, 1990 and ordered the parties to file supplemental briefs and evidence, if so desired. On February 15, 1990, the evening of the next aerial application, shelter was made available for the homeless by the Governor through the Cold Weather Armory Program because of a low-temperature condition in the area.

The Court continued the hearing date on the Order to Show Cause re Preliminary Injunction to March 6, 1990. Pursuant to the Court's instructions, plaintiffs filed Supplemental Support on February 20, 1990, and defendant Voss filed Supplemental Opposition on February 26, 1990. At the hearing on March 6, 1990, the Court found that the Eleventh Amendment did not bar suit insofar as plaintiffs sought prospective relief, but ruled that plaintiffs had not met the standard for issuance of a preliminary injunction.

### IV.

### DISCUSSION

#### A.

*Standard for Preliminary Injunction*

A preliminary injunction may only issue if plaintiffs demonstrate either a combination of probable success on the merits and a possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Beltran v. Myers*, 677 F.2d 1317 (9th Cir.1982).

---

1. The Cold Weather Armory Program is funded under a Federal Emergency Management Agency grant to the Orange County Homeless Issues Task Force. The armories may be used pursuant to an emergency proclamation by the Governor as emergency shelters when the air temperature in an area is at or below 40 degrees (F) or forecast by the National Weather Service to be 40 degrees or below. The armories are also opened during periods of rain when the air temperature is at or below 50 degrees (F) or when the National Weather Service forecast indicates the probability of rain to be greater than 50% and the air temperature to be 50 degrees or below. The County of Orange makes a determination by 10:00 a.m. each day between December 1, 1989 through March 31, 1990 as to whether weather conditions require opening the armories as shelters.

## B.

### Eleventh Amendment

■ The Eleventh Amendment prohibits federal courts from entertaining suits brought by private citizens against any state in the absence of that state's consent. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Naming a state official as the defendant rather than the state itself will not avoid the strictures of the Eleventh Amendment when the state is the real party in interest. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The state is the real party in interest when the judgment would tap the state's treasury or restrain or compel government action. *Id.* It is not disputed that in this action defendant Voss has been sued in his official capacity as Director of the California Department of Food and Agriculture rather than as an individual.

■ An exception for suits against state officers that impact on the state itself is allowed to prevent the enforcement of unconstitutional state action. Such suits are not considered suits against the state because the state cannot authorize officials to act in violation of the federal constitution. *Ex Parte Young,* 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908); *Almond Hill School v. United States Dept. of Agriculture,* 768 F.2d 1030, 1034 (9th Cir.1985). A federal court may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury. *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979). Such jurisdiction is, however, limited to actions wherein prospective relief alone is sought. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Will v. Michigan Dept. of State Police,* 491 U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

■ The relief sought in this action is to enjoin further spraying until the following is provided: (1) notice tailored to reach the homeless at least 48 hours prior to the aerial application of the Malathion bait; (2) the provision, at the state's expense, of shelter during the evening applications and transportation thereto (plaintiffs give the National Guard armories as an example); and (3) a post-spray outreach program to provide persons who come into direct contact with the Malathion bait a place to bathe and wash their clothes, money for the replacement of clothing and other personal articles soiled by the spray, and any medical attention necessary.

Parts (2) and (3) of the relief sought are directed against the public fisc and may therefore be beyond the Court's jurisdiction. To the extent, however, that plaintiffs seek to enjoin defendant Voss from further spraying in order to conform the state's conduct to the mandates of the federal Constitution, the Court has jurisdiction. It need not be decided whether the Eleventh Amendment would allow all aspects of the relief requested in light of the Court's disposition of the constitutional claims.

## C.

### Constitutional Claims

Plaintiffs claim that they possess liberty and property interests which have been infringed by the State without due process of law. The right to be free from grave bodily injury received by contact with the Malathion bait constitutes the liberty interest, while the property interest asserted concerns plaintiffs' belongings which become soiled by the Malathion bait and remain so because plaintiffs are unable to wash them promptly. Plaintiffs allege the notice of the dates and times of intended applications is inadequate in that it is not tailored to reach the homeless and does not adequately inform them of the effects of the spray.

Plaintiffs also contend that since the State is creating a danger to plaintiffs, it has created a special relationship with plaintiffs that requires the State to protect plaintiffs. Finally, plaintiffs allege a violation of substantive due process in that defendant's actions in proceeding to spray are intentional, unjustified, brutal, and offensive to human dignity.

*1. Deprivation Without Due Process of Law*

 In determining whether a person has been deprived of a liberty or property interest without due process of law, a court must first determine whether a deprivation has occurred before it considers whether such deprivation has been effected without due process of law. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Plaintiffs' allegation that the notice provided is inadequate is only of consequence if they first show a constitutional deprivation. *Id.*

 Plaintiffs contend that defendant Voss' continued aerial application of the Malathion bait threaten plaintiffs' rights to personal security. The right to personal security is a historic liberty interest protected by the Due Process Clause. *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982). This right to personal security includes the right to be free from intentional physical injury at the hands of state officials. *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir.1974). When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent that the state's actions have put the person at an increased risk. *Archie v. City of Racine,* 847 F.2d 1211, 1223 (7th Cir.1988); *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982).

To establish that the aerial applications of Malathion bait is causing plaintiffs harm, plaintiffs rely on the notice which the County of Orange Health Care Agency distributed to physicians in the Orange County area. Complaint, Exhibit 4. The notice states that direct irritant effects from airborne exposure to Malathion can be observed at moderate levels of exposure, and that persons sprayed directly with the pesticide or who breathe fairly concentrated vapors from sprayed surfaces may experience symptoms such as eye and throat irritation or chest tightness. *Id.* If exposure to the pesticide is prolonged, headache or nausea might develop. A common feature of such exposures is that the individual will complain of a pesticide odor.

*Id.* It recommends that individuals remain indoors 15 to 30 minutes after an aerial application of Malathion in order to avoid such possible exposure. The notice, however, clearly states that such symptoms will generally clear within an hour or two once exposure stops and will cause no residual ill effects. *Id.* It further states that absent an acute or severe poisoning episode, no serious or long-term health effects are expected following exposure to Malathion. *Id.,* at p. 26.

Plaintiffs also rely on a number of declarations submitted by various homeless and other individuals who allegedly suffered symptoms consistent with Malathion poisoning after being exposed to the spray. It appears that the named plaintiffs and a number of others slept on the street outside a laundromat and the University of California (Irvine) Medical Center and were exposed to the spray residue overnight. Declarations of Support, Exhibits 2, 4, 7, 9, 13. These individuals complained of a pesticide odor or bitter taste in their mouths.

In her declaration, Linda Dunlap, a registered nurse who feeds the homeless at Pioneer Park on Sundays, summarizes the complaints of 17 homeless individuals whom she interviewed at Pioneer Park after the spray. Declarations in Support, Exhibit 3, p. 11–12. The symptoms described to her by these individuals include chills, nausea, fatigue, vomiting coughing, headaches, watering eyes, rhinitis, taste affected, furry tongue, aching joints, hoarseness, dizziness, tremors, rash, pallor, and disorientation.

Plaintiffs also submit the declarations of Connie Johnson and Bernice Ranford. Declarations in Support, Exhibits 16, 8. Ms. Johnson was living in a motel with her baby the evening of January 25, 1990 and walked outside for one or two minutes with her baby during the spray. She alleges that the following morning she had a scratchy throat and headache, and that her baby threw up 3 times as a result of the exposure. Ms. Ranford lives in a house, but was outdoors for a number of hours during the spray on the evening of January

25, 1990. She alleges that she experienced nausea as a result of the exposure.

Dr. Lappe, Professor of Health Policy and Ethics at the University of Illinois College of Medicine, indicates that many of the symptoms described by plaintiffs and other homeless individuals in their declarations are consistent with Malathion poisoning. Declarations in Support, Exhibit 17. He also notes that the violent mood swings and bizarre dreams reported by plaintiff Talevich (Declarations of Support, Exhibit 4) are pathognomic of organophosphate poisoning.

Dr. Benler, currently the Head of the Department of Ophthalmology at the Naval Hospital Long Beach, states the ocular complaints described in the declarations are symptoms consistent with organophosphate toxicity. Declarations in Support, Exhibit 19. He further notes that miotic effects may in rare instances trigger angle-closure glaucoma through topical exposure, an ocular emergency leading to rapid blindness unless treated surgically.

Dr. Broughton, Medical Director of Antibody Assay Laboratories in Orange, states that the symptoms described in the declarations are consistent with Malathion poisoning. Declarations in Support, Exhibit 18. He further states that anyone who comes into direct contact with the spray and is unable to wash is "at risk," and that the symptoms described "must be considered secondary to malathion spray until proved otherwise."

Plaintiffs have the burden of proof to show that the symptoms of which plaintiffs complained were caused by the Malathion spraying and constituted grave personal injury. The declarations submitted by plaintiffs only go so far as to state that the symptoms exhibited are consistent with Malathion poisoning. They do not establish that the conditions described were caused by the aerial applications. No one reports permanent illness.

Plaintiffs do not present evidence that any attending physician has ever reported, as would be required by law, any incident of Malathion poisoning. While counsel for plaintiffs argue that the homeless, because of their lot, are unable to obtain regular medical treatment, the only report of a physician attending one of the declarants not only fails to indicate that she suffered from Malathion poisoning, but tends to show that a myriad of afflictions plague her health (hepatitis, cancer, alcohol intoxication, foot injury). Supplemental Support, Exhibit 2.

To be weighed against plaintiffs' evidence is, first, the declaration of Dr. Kurtz. Supplemental Opposition, Exhibit 3. Dr. Kurtz indicates that homeless individuals are generally exposed to a wide variety of conditions, many of which are not conducive to good health. The adverse conditions to which plaintiffs are exposed are likely to produce the very symptoms described in the plaintiffs' declarations.

Next, the declaration of Dr. Stratton, a medical epidemiologist with the Department of Health Services, Pesticide Unit, indicates that the aerial application of Malathion at the indicated dosage does not pose undue health risks to those exposed to that spray. Getz Declaration, Stratton Declaration, p. 6–7. He reports that Malathion in the environment tends to break down quickly, generally in three to seven days. Furthermore, it does not build up in the human body and is readily excretable at the low dosage applied. He also mentions a 0.5% Malathion shampoo prescribed for head lice, suggesting a beneficial effect on human skin. *Id.*

Plaintiffs also allege a deprivation of a property interest in that their bedding and clothes are soiled by the Malathion bait. Many of the declarations in support allege that it is difficult for the homeless to get a change of clothes or bedding to replace what was soiled by the Malathion bait, and that they were not able to wash their bedding or change their clothes until some days after the spray because of the cost involved. Declarations in Support, Exhibits 11, 13–15. However, the plaintiffs' themselves acknowledge that their personal articles are washable with soap and water. Plaintiffs have presented no evidence that their personal articles have been destroyed by exposure to the bait.

### 2. Special Relationship

Plaintiffs contend that since the State is creating a danger to plaintiffs, it has created a special relationship with plaintiffs that requires the State to protect plaintiffs. When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent that the state's actions have put the person at an increased risk. *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir.1988); *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982).

In *Archie v. City of Racine*, 847 F.2d 1211 (9th Cir.1988), the court held that no federal constitutional right was raised by the failure of the state to provide emergency medical response services to an ailing individual because the state had not created or increased the risk to that individual. While plaintiffs in this action may be susceptible to a variety of ailments due to their homeless condition, the state has not been shown to be responsible for their homeless condition.

Plaintiffs accuse defendant of continuing to spray Malathion without making any provision for its potential health effects and therefore engaging in a policy "that he has ample reason to know may cause needless physical injury to the homeless." Citing *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1446 (9th Cir.1986), plaintiffs assert that defendant's policy "can fairly be characterized as intentional, unjustified, brutal and offensive to human dignity." Supplemental Support, p. 9. The only assertion without dispute is the intentional nature of the aerial spraying conducted by Voss. It cannot, in the face of defendant's evidence, fairly be said to be unjustified nor can it fairly be equated with circumstances of a police brutality case.

### 3. Substantive Due Process Violation

■ Even if a showing of harm could be made, it is doubtful that it would rise to the level of a violation of substantive due process. A violation of substantive due process is shown only when the conduct involved is such as to "shock the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). *See Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Rutherford v. City of Berkeley*, 780 F.2d 1444 (9th Cir.1986) (unprovoked assault and battery by police taking plaintiff into custody); *Gregory v. Thompson*, 500 F.2d 59, 61 (9th Cir.1974) (justice of the peace forced plaintiff out of courtroom, threw him to the floor, jumped on him and began to beat him).

While many of the symptoms described in plaintiffs' declarations in support are to be credited, they do not rise to the level of shocking the conscience when weighed against the justification offered by defendant and the potential harm posed by the Medfly.

### D.

#### Balance of Hardships

Plaintiffs have failed to show a likelihood of success on the merits. However, a preliminary injunction may still issue if a serious questions is raised and the balance of hardships tips sharply in the moving parties' favor. *Beltran v. Myers*, 677 F.2d 1317 (9th Cir.1982).

The state interest involved in this case is clear. The Medfly poses a severe threat to the economy and welfare of the State of California. The U.S. Department of Agriculture, the Governor of California, and the County of Orange have declared a state of emergency with respect to the Medfly infestation. The State is engaged in an Emergency Eradication Project in an attempt to eliminate the Medfly infestation. Defendant has shown that this emergency project is aimed to prevent a devastating impact on the economy and welfare of the citizens of California.

It is significant to take into account that, if the eradication is not accomplished, an additional 225,000 pounds of pesticide per year would need to be applied by California growers in an effort to control the Medfly, as well as an additional 2.2 million pounds of pesticides by individual home owners or back yard gardeners. Getz Declaration,

Siddiqui Declaration, p. 29. Such a program may have much more devastating effects on the health of state citizens than the Malathion applications.

On the other hand, plaintiffs have failed to present convincing proof that the aerial application of the Malathion bait is the cause of the symptoms reported in the declarations submitted by plaintiffs. Moreover, the gravity of the claimed injuries has not been established. Plaintiffs are generally exposed to a wide variety of conditions as a result of their homelessness which account for the symptoms described in the various declarations submitted by plaintiffs. As earlier noted, fortunately, no person claims a permanent health impairment.

## V.

### CONCLUSION

The Court has jurisdiction over defendant Voss insofar as the complaint seeks prospective injunctive relief to conform the State's actions with the mandates of the Federal Constitution. However, plaintiffs have failed to satisfy the test for issuance of a preliminary injunction. They have not shown that they are likely to succeed on the merits or that there is a possibility of irreparable injury. Plaintiffs have, at this juncture, failed to establish a constitutional deprivation of either a liberty or property interest or to show that the conduct involved is such as to "shock the conscience". The balance of hardships has been shown to tip in favor of defendant.

Accordingly, the Court denies plaintiffs' Application for Preliminary Injunction and this day adopts defendant's proposed Findings of Fact and Conclusions of Law, as modified by this Court.

IT IS SO ORDERED.