[No. S039245. July 17, 1995.]

ALFONSO MACIAS et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

## COUNSEL

Litt, Marquez & Fajardo, Litt & Marquez, Barrett S. Litt, Anne Richardson and Ben Margolis for Plaintiffs and Appellants.

Patti A. Goldman, Kristen L. Boyles, Williams S. Curtiss, Brian Wolfman, Adele P. Kimmel, Arthur H. Bryant, Stuart Miller, Vivienne J. Alston, Mark Rosenbaum, Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter and Michael D. Macomber as Amici Curiae on behalf of Plaintiffs and Appellants.

Haight, Brown & Bonesteel, Roy G. Weatherup, Mary Ann Murphy, Munger, Tolles & Olson, Charles D. Siegal, Allison B. Stein and Mark A. Merva for Defendants and Respondents.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter Wunderlich, Asssistant Attorney General, Charles W. Getz IV, Deputy Attorney General, Harvey M. Grossman, McKenna & Cuneo, Lawrence S. Ebner, Crosby, Heafey, Roach & May, James C. Martin, Preuss, Walker & Shanagher and Alan J. Lazarus as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**ARABIAN, J.**—This case arises out of the noted efforts of the State of California (State) to eradicate periodic infestations of the Mediterranean fruit fly (Medfly) through wide-scale helicopter spraying of the insecticide malathion. Three times over the last twenty-five years our Governors, acting pursuant to their extraordinary powers under the Emergency Services Act (Gov. Code, § 8550 et seq.) have declared a state of emergency arising from

conditions of "extreme peril" to the State's agricultural industry caused by discoveries of Medfly infestations. The instant case concerns a minor who claims that during one of these emergencies he suffered serious and irreparable injuries from exposure to the malathion spray.

The question before us is whether the defendant malathion manufacturers and distributors had a duty to disseminate health warnings to the public, or to take other measures to protect the general welfare, after they became aware of certain alleged deficiencies in the State's warnings. We hold that no such duty devolved upon them. As explained more fully in the discussion which follows, to impose a common law duty to intervene in a declared state of emergency would represent an unprecedented intrusion on the State's police power to protect the citizens and economy of California in times of extreme peril. To authorize, indeed to compel, a party to undermine the public health warnings promulgated and published by the State under a specific statutory mandate could severely compromise the government's ability to respond effectively to the emergency. Thus, we conclude that summary judgment was properly entered in favor of defendants. Having so determined, we need not resolve the subsidiary question whether plaintiffs' claims are preempted by federal law regulating the labeling of insecticides.

## I. FACTS[1]

Since the mid-1970's, Medfly invasions have posed a serious and recurring threat to the agriculture of California. As noted, at least three times during the last twenty-five years the Governor has declared a state of emergency arising from the "conditions of extreme peril to the agricultural industry and the safety of agricultural properties" within certain counties caused by discoveries of Medfly infestations. The first such emergency was declared in 1980 and resulted in the development of an eradication program that used wide-scale aerial spraying of the insecticide malathion mixed with protein bait. Spraying of the malathion/bait mixture continued periodically thereafter whenever pockets of Medfly infestation were discovered; in 1988, portions of Los Angeles County were sprayed pursuant to an emergency declaration by the Governor.

---

[1]The trial court entered judgment in favor of the defendants after granting their motion for summary judgment. No discovery had taken place prior to the court's ruling, however; the trial court simply assumed the truth of the allegations in plaintiffs' second amended complaint for purposes of ruling on the legal issues raised in the motion. As the trial court explained, its ruling was "[b]ased upon the pleading[s] and the case law." Hence, the motion for summary judgment was treated in legal effect as a motion for judgment on the pleadings, which, like a demurrer, assumes the truth of the material factual allegations of the complaint. (*Heredia* v. *Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1358-1359 [279 Cal.Rptr. 511].) For purposes of review, the Court of Appeal here similarly assumed the material facts in the complaint to be true. We shall likewise, for present purposes, assume the truth of the material factual allegations of plaintiffs' second amended complaint.

In August 1989, the Governor declared another state of emergency within Los Angeles County due to Medfly infestation. Pursuant to this declaration, the State obtained malathion manufactured and distributed by defendants American Cyanamid Company, Platte Chemical Company and United Agri Products, and contracted with defendant San Juan Helicopters, Inc., to perform the aerial disbursement of the malathion/bait.

Insecticides such as malathion are regulated by the Environmental Protection Agency (EPA) pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. §§ 136-136y). EPA-approved labeling for malathion did *not* include use of the insecticide against the Medfly. Accordingly, in November 1989 the State obtained a "special local needs registration" from the EPA to permit an "off-label" use of malathion (7 U.S.C. § 136v(c)(1)) and an emergency exception, pursuant to the provisions of FIFRA (7 U.S.C. § 136p), authorizing an unregistered use of the chemical to meet the Medfly emergency.

The special local needs registration provided, in pertinent part, as follows: "The public shall be given prior notification via appropriate news media and departmental literature handouts of the treatment area schedules. Such information shall include the date treatment is to be made, material to be used, *and the precautions listed on the product label.*" The warning protocol formulated by the State required written notification in the form of a "flyer" hand-delivered to each residential unit in the treatment area; the flyers were to include the disbursement schedule, the pesticide to be applied, any health, safety or other precautions to be taken by residents of the eradication area, and telephone numbers to call for additional information.

Plaintiffs Alfonso and Sophia Macias and their 14-year-old son Juan resided in one of the treatment areas. Plaintiffs assert that the health warnings actually given by the State were grossly inadequate, and differed markedly from the product labeling approved by the EPA. That labeling, attached as an exhibit to plaintiffs' complaint, included the following warnings: "CAUTION [¶] "IF SWALLOWED: Drink 1 or 2 glasses of water and induce vomiting . . . . Call a physician. [¶] IF ON SKIN: Wash with plenty of water. Call a physician. [¶] IF IN EYES: Flush with plenty of water. Call a physician if irritation persists. [¶] CAUTION: Harmful by swallowing, inhalation or skin contact. Avoid breathing spray mist. Avoid contact with skin. Wash thoroughly after handling. Change contaminated clothing."

The flyers distributed by the State throughout the Medfly treatment area did not contain the health warnings set forth in the EPA-approved label. The State's flyer, attached as an exhibit to plaintiffs' complaint, stated as follows: "NO HEALTH HAZARD: [¶] Malathion is considered one of the safest

insecticides in use today. For more than 35 years, it has been widely used by home gardeners. It is used in many U.S. cities to control mosquitoes, and in Europe, it is used by physicians to treat head lice in children. Health authorities agree that, at an extremely low dose, pregnant women have no cause for concern."

Thus, in contradistinction to the warnings set forth in the EPA-approved label, the State's flyers represented that malathion posed no health risks and failed to alert persons exposed to the spray to wash immediately and consult a physician. The State's flyers did warn, however, that the spray could cause "discoloration to the finishes of some cars" and advised residents to place their cars "in the garage, or cover" them to avoid exposure.

Plaintiffs alleged that an aerial disbursement of the malathion/bait mixture took place on the evening of March 28, 1990, in their residential area. As the helicopters approached, the minor Juan Macias, relying on the State's representations, left his house and went outside without taking any protective measures against personal contact with the spray, to tell his father to cover the family car. The helicopter passed low overhead and deposited large amounts of the malathion/bait mixture on Juan's head, face, and other exposed parts of his body. Shortly after his exposure to the spray, Juan's eyes reddened and became painful and his vision began to deteriorate. Unaware of any connection between these symptoms and the malathion spray, however, plaintiffs took no remedial action and sought no immediate medical assistance. Eventually plaintiffs consulted a physician after Juan's eyesight continued to deteriorate, but it was too late to prevent serious injury; Juan's exposure to the spray eventually resulted in legal blindness. Plaintiffs alleged that, had they been properly warned of the health risks of malathion, Juan would not have ventured outside during the aerial disbursement, or, had he done so, they would have washed his face and eyes with water and sought immediate medical attention, thereby preventing the deterioration of his eyesight.[2]

## II.  PROCEDURAL HISTORY

Plaintiffs filed the instant lawsuit against the manufacturers and distributors of the malathion utilized by the State (American Cyanamid Company, United Agri Products, and Platte Chemical Company), the helicopter company which contracted with the State to dispense the malathion (Joaquin

---

[2]A subsequent EPA peer review, attached as an exhibit to plaintiffs' opposition to the State's joinder in American Cyanamid Company's demurrer, noted the existence of medical evidence that "serious eye damage" may follow from exposure to organophosphate pesticides such as malathion. The medical study under review specifically referenced the case of Juan Macias, noting the conclusions of two physicians that the patient's loss of vision was due to malathion exposure.

Helicopters, Inc.) and various governmental entities and officers including the State, the California Department of Health Services, and its director, Kenneth Kizer.[3] In their second amended complaint, plaintiffs alleged, inter alia, that the governmental defendants were negligent and breached mandatory statutory duties in failing to notify the public of the health risks enumerated in the EPA-approved malathion label. Plaintiffs asserted that the governmental defendants intentionally and deliberately withheld such information from the public for the specific purpose of suppressing political opposition to the Medfly eradication program. They further alleged that the Governor's emergency declaration was invalid because the State had known of the Medfly danger for the "prior ten year period" and had "failed to adequately deal with" the problem.

Plaintiffs' claims against the defendant chemical manufacturers and distributors (hereafter defendants) were also based upon a failure to warn. Specifically, plaintiffs alleged that defendants were aware of the State's intended use of the malathion, knew that the public had not been warned of the health risks enumerated in the EPA-approved labels, and, in fact, understood that the public had been affirmatively misled by the State to believe that the malathion posed no health risks. Plaintiffs further alleged that defendants were aware that malathion may be particularly toxic to children, the sick and the elderly, that exposure of the skin or eyes of persons in these vulnerable population groups could cause organophosphate poisoning leading to partial or total blindness, and that such dangers were generally not known by the public or set forth in the notices distributed by the State.

Notwithstanding their awareness of the alleged deficiencies in the State's warnings, defendants made no attempt either to induce the State to modify its warnings, or to warn the public directly. In thus failing, under the circumstances, to undertake any measures to ensure that plaintiffs were adequately apprised of the health risks posed by the malathion spray, defendants breached a common law duty to warn sounding in both negligence and strict product liability.

Defendants moved for summary judgment or, in the alternative, summary adjudication of issues.[4] The trial court addressed the motion in three separate orders. The first order addressed defendants' assertion that plaintiffs' failure-to-warn claim was preempted by FIFRA. The court ruled that the claim was

---

[3]Other governmental defendants included the California Department of Food and Agriculture, the Los Angeles County Board of Supervisors, the Los Angeles County Department of Health Services, the Governor, and the Director, Assistant Director and Associate Director of the California Department of Food and Agriculture.

[4]Although American Cyanamid was the moving party, plaintiffs entered into a stipulation that the trial court's ruling would apply equally to defendants United Agri Products and Platte Chemical Company.

preempted only to the extent that it was based upon an alleged "inadequacy of the EPA-approved labeling . . . ." To the extent that the complaint was based upon an alleged common law duty to warn not only the purchaser of the malathion (in this case the State) but the public, as well, the court held that FIFRA did not apply. As the trial court explained: "The duty posited here is simply that the pesticide manufacturer must take some action to notify potentially affected parties of a pesticide use not in accordance with EPA requirements or warnings. An imposition of liability for breach of this theoretical duty would not create an occasion for modification of the EPA-approved labeling. Hence such a claim would not be preempted . . . ."

In its second and third orders the trial court considered the validity of the failure-to-warn claim itself. The court noted that the State, as the immediate purchaser, was aware of the contents of the EPA-approved malathion labels. Indeed, the State was directly responsible for obtaining the special "local needs registration" from the EPA, which conditioned approval of the Medfly program upon the State's providing public notice of the "precautions listed on the product label." Thus, the trial court concluded that defendants had reasonably relied on the State to comply with its legal obligations to warn the public, and owed no further duty to plaintiffs.

Nor, the trial court ruled, were defendants affirmatively obligated to monitor the State's warnings and to intervene if they proved to be inadequate. As the court explained: "It would be quite anomalous for state statutory law to authorize a government program of this type and to allocate responsibilities for its effectuation, while at the same time [S]tate case law required suppliers to monitor the program and to involve themselves in the program, especially when the object of a supplier would not be to carry out the objective of the statutorily authorized program, but rather to absolve itself of potential liability . . . . No existing authority imposes such a duty on [defendants]."

Nor did it matter, in the trial court's estimation, whether defendants actually *knew* the State had omitted the EPA warnings from its public notices. As framed by the trial court, the issue was whether a manufacturer, "upon obtaining actual knowledge that its product is being used without proper warnings, incurs a duty of some scope to take action of some type to counteract the lack of proper warning, presumably by providing information or warnings of some type to downstream users or potential bystanders."[5]

The trial court ruled in favor of defendants on this point, as well. Its rationale was twofold. First, as a policy matter, the trial court reasoned that

---

[5]In their motion for summary judgment defendants disclaimed any knowledge of the alleged inadequacies of the State's warnings. Plaintiffs disputed this assertion. As noted, however, defendants filed their motion before any discovery had taken place and the trial

imposing any additional duty upon defendants might discourage chemical manufacturers from "supplying pesticides for use" in State-sponsored programs and thereby "interfere [with] the carrying out of legislative objectives . . . ." Second, the trial court ruled that a manufacturer is required to provide warnings to those *other* than the immediate purchaser only where, in the language of the Restatement Second of Torts section 388, subdivision (b), the manufacturer "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." Defendants here clearly had "no reason to believe" the State would not "realize" the dangerous propensities of malathion; indeed, as noted, the State was responsible for obtaining EPA approval for use of the malathion spray, and was required by federal and state law to convey to the public all necessary health warnings.[6] Thus, the trial court concluded that defendants had reasonably relied on the State to provide any necessary warnings to residents of the Medfly spray area, and owed no additional duty to plaintiffs as a matter of law. Accordingly, the trial court granted the motion for summary judgment and entered judgment in favor of defendants.

The Court of Appeal, in a divided opinion, reversed. Although it concurred in the trial court's judgment that the action was not preempted by FIFRA, it disagreed with the lower court's finding that defendants had discharged their duty to warn as a matter of law. Whether defendants had reasonably relied upon the State to convey the EPA-approved health warnings to the affected public represented, in the Court of Appeal's judgment, a material question of fact which was not susceptible to resolution by summary judgment. Unlike the trial court, however, the Court of Appeal did not consider the significance of the fact that the purchaser of the malathion was not a private entity engaged in a normal commercial transaction, but rather the State acting pursuant to a declared agricultural emergency.

We granted defendants' petition for review.[7]

court thereafter expressly stayed discovery pending its ruling on the motion. Thus, the trial court assumed, without deciding, that the State's warnings were inadequate and that defendants were aware of the deficiencies.

[6]Food and Agricultural Code section 5029, subdivision (a) requires the Department of Food and Agriculture to "design and implement a program to provide information to persons who reside in areas scheduled to be treated with pesticides on an emergency basis in order to eradicate plant pests." Subdivision (b) of the statute provides that the program "shall be designed to provide the greatest amount of information practicable to affected citizens." (Food & Agr. Code, § 5029, subd. (b).)

[7]The State is not a party to this appeal, although it did file an amicus curiae brief in support of defendants with the Court of Appeal. Plaintiffs' action against the State and the other governmental entities and officials named in the second amended complaint presumably remains pending.

## III. DISCUSSION

■ The fundamental issue may be succinctly stated: was it reasonable for defendants here to rely on *the State* to convey the requisite EPA-approved warnings to the residents of the Medfly spray area, or should they have affirmatively intervened in the State's prosecution of the Medfly emergency to provide a more affective warning? Defendants emphasize in this regard several largely undisputed facts. The State was fully cognizant of the warnings set forth in the EPA-mandated malathion labels; indeed, the State was solely responsible for obtaining EPA approval for the "off-label" use of malathion in the Medfly program, and was affirmatively responsible, as a condition of EPA approval, for ensuring that the public was informed of "the precautions listed on the product label." Moreover, the State's decision to produce and distribute the allegedly inadequate warnings was made unilaterally pursuant its statutory authority under the Emergency Services Act (Gov. Code, § 8550 et seq.) and provisions of the Food and Agricultural Code, which are more fully discussed below. Plaintiffs assert, in response, that regardless of the State's knowledge of the risks and its statutory responsibilities, defendants were nevertheless obligated to intervene when they became aware of the alleged deficiencies in the State's public notices.

In addressing this question, the Court of Appeal and the parties have focused primarily on whether and under what circumstances a product manufacturer may reasonably rely upon an intermediary in the chain of distribution to convey any necessary warnings to the public. A substantial body of case law has developed around this subject, and judicially created doctrines such as the "sophisticated purchaser" and "bulk supplier" defenses have become familiar maxims of product liability law. (See, e.g., *Groll* v. *Shell Oil Co.* (1983) 148 Cal.App.3d 444 [196 Cal.Rptr. 52]; *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 989 [95 Cal.Rptr. 381]; Rest.2d Torts, § 388, com. n, pp. 307-310; Note, *Failures to Warn and the Sophisticated User Defense* (1988) 74 Va. L.Rev. 579.) As discussed below, however, the case before us involves specific and fundamental issues of legislative and public policy which, factored into the duty analysis, prove to be dispositive and thus render such abstract doctrines largely superfluous.

### A. *Statutory Background*

As noted earlier, the Medfly eradication program that resulted in plaintiff's injuries was set in motion when the Governor declared a state of emergency at the request of the Los Angeles County Board of Supervisors, which had earlier declared a local emergency (Gov. Code, § 8630). The California Emergency Services Act (Gov. Code, § 8550 et seq.) confers

upon the Governor and the governing bodies of cities and counties the power to declare a state of emergency "in conditions of disaster or . . . extreme peril" and confers broad powers on the Governor to deal with such emergencies. (Gov. Code, § 8550.) During a state of emergency, for example, the Governor may suspend any regulatory statute or the orders, rules or regulations of any state agency if these would "prevent, hinder, or delay the mitigation of the effects of the emergency." (Gov. Code, § 8571.) The Governor may commandeer or utilize any private property or personnel deemed to be necessary to carry out his responsibilities (Gov. Code, § 8572), and is empowered to make expenditures from any fund "legally available . . . to deal with actual or threatened conditions of [the emergency]." (Gov. Code, § 8645.)

One of the primary purposes of the act is to ensure that "all emergency services functions" of the State and local governments, the federal government, and "private agencies of every type," "be coordinated . . . to the end that the most effective use be made of all manpower, resources, and facilities for dealing with any emergency that may occur." (Gov. Code, § 8550.) To further that end, the Governor is charged with the responsibility to coordinate the emergency plans and programs of all local agencies, "such plans and programs to be integrated into and coordinated with the State Emergency Plan and the plans and programs of the federal government and of other states to the fullest possible extent." (Gov. Code, § 8569.)

■ Thus, the Emergency Services Act makes clear that in situations of "extreme peril" to the public welfare the State may exercise its sovereign authority to the fullest extent possible consistent with individual rights and liberties. As summarized in *Martin* v. *Municipal Court* (1983) 148 Cal.App.3d 693, 696 [196 Cal.Rptr. 218] (upholding the Governor's emergency power to prosecute an earlier Medfly eradication program), "The [act] recognizes and responds to a fundamental role of government to provide broad state services in the event of emergencies resulting from conditions of disaster or of extreme peril to life, property, and the resources of the state. Its purpose is to protect and preserve health, safety, life, and property." The act makes equally evident the overriding necessity of a broadly *coordinated* effort to deal with emergencies, and places the primary responsibility, and the means for carrying out such efforts, with the State.

In declaring the instant emergency, the Governor found that "conditions of extreme peril to the agricultural industry and the safety of agricultural properties exist within the County of Los Angeles . . . caused by the discovery of an infestation of the Mediterranean Fruit Fly, on or about July 20, 1989." The Governor thereupon implemented the State's peacetime

emergency plan, calling upon all State agencies to utilize the personnel, equipment and facilities at their disposal "to alleviate th[e] emergency." Shortly thereafter, the State, acting through the Department of Food and Agriculture, obtained a special local needs registration from the EPA to permit an off-label use of malathion in the Medfly eradication program. Pursuant to the declaration of emergency, the State also applied for, and received, a emergency exemption from the EPA, to allow an unregistered use of malathion to meet the emergency conditions.[8]

The State thereupon commenced the Medfly eradication program in Los Angeles in 1989-1990. A major focus of the State's eradication effort was the design and implementation of a public information protocol, in compliance with certain provisions of the Food and Agricultural Code adopted expressly for that purpose. Under Food and Agricultural Code section 5029, the State Department of Food and Agriculture is required to "design and implement a program to provide information to persons who reside in areas scheduled to be treated with pesticides on an emergency basis in order to eradicate plant pests." (Food & Agr. Code, § 5029, subd. (a).) As provided by statute, the purpose of the program "is to provide information about the health effects of the pesticides used in eradication projects. The program shall be designed to provide the greatest amount of information practicable to affected citizens. The department shall conduct outreach efforts to inform the public about the existence of this program." (Food & Agr. Code, § 5029, subd. (b).)

Other statutes delineate in precise and detailed terms the nature of the "outreach" efforts required of the State during an eradication project. Food and Agricultural Code section 5771 provides that the State "shall notify residents and physicians practicing in the area, and the local broadcast and print media, before aerially applying an economic poison to effect the eradication."[9] The State's notice must be "delivered at least 72 hours prior to applying the economic poison" except when the application is "pursuant to an emergency, [when] the notice shall be delivered at least 24 hours" in

---

[8]Although the states may regulate the sale or use of pesticides (*Wisconsin Public Intervenor v. Mortier* (1991) 501 U.S. 597 [115 L.Ed.2d 532, 111 S.Ct. 2476]; 7 U.S.C. § 136v(a)), FIFRA expressly preempts pesticide labeling or packaging. (7 U.S.C. § 136v(b).) Section 24(c) of FIFRA and the EPA's regulations allow a state to issue an intrastate registration of pesticide uses not authorized by the EPA ("off-label" uses) to meet special local needs. (7 U.S.C. § 136v(c)(1); 40 C.F.R. pt. 162 (1992).) Additionally, under section 18 of FIFRA and the EPA's regulations, the EPA may grant an exemption to a federal or state agency to allow an unregistered use of a pesticide to meet emergency conditions. (7 U.S.C. § 136p; 40 C.F.R. pt. 166 (1992).)

[9]The requirement of notice to the local broadcast and print media was added by the Legislature in 1990, and therefore was not in effect when this case arose. (Stats. 1990, ch. 1678, § 1.)

advance of the scheduled treatment. (Food & Agr. Code, § 5772.) The notice must be delivered to each residential unit and physician within the treatment area (Food & Agr. Code, § 5773); hand delivery is required when practicable, otherwise notice must be accomplished by first class mail. (Food & Agr. Code, § 5774.) Any change in the scheduled date of application must also be communicated to residents, as well as the local broadcast and print media, at least 96 hours in advance. (Food & Agr. Code, § 5775.) The State's notices must be in both English and in any other language if over 5 percent of persons receiving the notice speak only that language. (Food & Agr. Code, § 5777.)

The contents of the State's notice is also statutorily prescribed. (Food & Agr. Code, § 5776.) It must contain the "date and approximate time" of all proposed pesticide applications, the "type of economic poison" to be applied, any "health and safety precautions that should be taken," and the address and telephone numbers of "public health personnel . . . familiar with the eradication program." (*Ibid.*) In addition, the State is required to establish and operate telephone "hot lines" to "provide information to the public on health issues related to application of the economic poison." (Food & Agr. Code, § 5778.)

B. *No Duty to Warn*

As even a summary description of the foregoing statutes makes vividly clear, the power to declare and abate a public emergency represents a formidable undertaking. It is, without a doubt, the single most compelling and absolute exercise of *sovereign* authority that the State, acting through its chief executive, may pursue. The court in *Martin* v. *Municipal Court, supra,* 148 Cal.App.3d 693, was accurate when it observed that the Emergency Services Act "*responds to a fundamental role of government*" to provide broad public relief in the event of an emergency. (*Id.* at p. 696, italics added.) To take action in times of "extreme peril to life, property, and the resources of the state" (Gov. Code, § 8550) clearly represents the quintessential *governmental* function. The Emergency Services Act reflects this understanding of the State's sovereign responsibility; as noted, it concentrates considerable power in the Governor to control and coordinate the efforts of all the various State agencies and local governments to ensure the most efficient and effective response "in conditions of disaster or . . . extreme peril." (Gov. Code, § 8550.)

Although plaintiffs here dispute the necessity of the Governor's emergency declaration, there is no question that the State, in prosecuting the Medfly eradication program, was acting pursuant to its authority under the

Emergency Services Act to safeguard the property and security of its citizens. In the two reported cases to consider claims arising from the aerial Medfly program, one found that the State's actions "were in response to a statewide emergency of potentially huge proportion" (*Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494, 501 [221 Cal.Rptr. 225]), while the other noted that the Medfly "emergency project is aimed to prevent a devastating impact on the economy and welfare of the citizens of California." (*Talevich* v. *Voss* (C.D.Cal. 1990) 734 F. Supp. 425, 433.) Thus, the court in *Farmers* held that the State's interest in combating the Medfly threat provided a "complete defense" to the plaintiff's trespass and nuisance claims (175 Cal.App.3d at p. 503); similarly, the district judge in *Talevich* rejected a due process challenge to the eradication program based upon allegedly inadequate State warnings. (734 F.Supp. at pp. 430-433.)

Furthermore, although the accuracy of the State's health warnings is clearly the subject of bitter dispute, it is generally uncontested that the warning protocol designed and implemented by the Department of Food and Agriculture during the 1989-1990 Medfly eradication program conformed to the statutory requirements discussed above. Leaflets containing information in both English and Spanish were hand delivered to residents of the Medfly spray area; the State's notice set forth the scheduled application dates, some health information, and telephone numbers where additional information could be obtained. Notices were also sent to local physicians, hospitals, public health clinics, and schools. In addition, health department officials appeared before various news media, local government agencies, and civic groups to discuss the eradication program and address public concerns. The county health department established a "health effects" hot line, as did the Department of Food and Agriculture, which together fielded many thousands of telephone calls during the emergency period.

To hold in these circumstances that a private citizen or corporation was compelled, at the risk of potentially substantial civil damages, to interfere with the State's comprehensive efforts to respond to the Medfly emergency would be truly extraordinary. Plaintiffs ask this court, in effect, to recognize a private tort duty to judge independently the adequacy of the State's emergency warning protocol and, if found wanting, to undertake a separate public information campaign in direct *conflict* with that promulgated by the State. Alternatively, they would have us impose on defendants a duty to demand that the State modify its public notices to include the EPA-approved warnings and, should the State fail to comply, a further duty to halt future shipments of the pesticide.

To accept plaintiffs' position would be to contravene fundamental legislative judgments implicit in the Emergency Services Act and the Food and

Agricultural Code. The former makes it clear that in times of "extreme peril" to the public all relief efforts must be coordinated under the centralized command of *the State*. (Gov. Code, § 8550.) The latter similarly places direct responsibility on the State for the development and dissemination of an appropriate public notice, including all necessary health warnings, prior to the emergency application of pesticides in populated urban areas. (Food & Agr. Code, § 5029.) To judicially impose a private duty to design and disseminate independent warnings in direct conflict with those formulated by the State would represent an unprecedented intrusion on the State's sovereign authority, recognized in the Emergency Services Act, to command and coordinate all relief efforts during a declared state of emergency.

This is not to say that the law necessarily preempts all private voluntary efforts during an emergency; indeed, the Emergency Services Act specifically contemplates the contribution of "private agencies of every type" in coordination with the State, federal, and local governments. (Gov. Code, § 8550.) We need not conclude that the provisions of the Emergency Services Act and the Food and Agricultural Code preempt all independent relief efforts, however, to hold that the legislative policies evident in these acts militate against the recognition of a private tort duty to second-guess, and affirmatively interfere with, the State's decisions as to how best to respond in an emergency.

We have recognized that certain areas of law are peculiarly appropriate to legislative judgment, and have deferred in such cases to the policies implicit in statutes and administrative regulations in determining a tort duty of care. (See, e.g., *Ramirez* v. *Plough, Inc.* (1993) 6 Cal.4th 539, 550-555 [25 Cal.Rptr.2d 97, 863 P.2d 167, 27 A.L.R.5th 899] [declining to judicially declare a tort duty to provide drug warnings in languages other than English where state and federal law had failed to do so].) This is plainly such a case. Defining the locus of power and responsibility during "conditions of disaster or . . . extreme peril to life, property, and the resources of the state" is a task for which the Legislature is peculiarly well suited, and the State is the natural and logical repository of such power and responsibility. In the Emergency Services Act and related provisions of the Food and Agricultural Code the Legislature has provided a clear framework of authority, so that, as we observed in a somewhat analogous situation, "affected persons and entities, in both the private and public spheres, *know exactly what is expected of them.*" (*Ramirez* v. *Plough, Inc., supra*, 6 Cal.4th at p. 551, italics added.)

A public emergency is not a time for uncoordinated, haphazard, or antagonistic action. It requires little imagination to perceive the perils lurking in plaintiffs' arguments. Fearing potential civil damages for failure to

act, private entities or even local governmental entities may feel compelled to question the State's judgment during a declared emergency and, when in doubt, to challenge the State's response. The result, of course, would be complete chaos, with state and private entities working simultaneously at cross-purposes. More important, the damage to the public interest could be irreparable. For example, under plaintiffs' proposal, if the State decided to release water from an overburdened reservoir during a flood emergency and a local district feared the effect on downstream properties, it might be constrained to sue the State to enjoin the proposed action, or risk civil penalties for failing to do so. The State's emergency response would thus grind to a halt while the internecine court battle raged, and the floodwaters continued to rise.

The instant case contains the seeds of an equally disturbing scenario. In response to the declared emergency, the State here had designed and promulgated a detailed public-outreach program containing, inter alia, certain health information. Its duty was to convey the most complete and accurate health information practicable to the affected citizens. (Food & Agr. Code, § 5029, subd. (b).) It is probably no exaggeration to state that the program's ultimate success depended upon the public's complete trust and confidence in the medical information contained in the State's official findings and public pronouncements.

If, in addition to the information conveyed by the State, the public had also received urgent notices from defendants stating that malathion posed a substantially different and far more serious health threat than that allowed by the State, the eradication program might have been fatally compromised. Certainly the time and resources necessary to address the public's concerns would have delayed, if not derailed, implementation of the program in circumstances where time was of the essence. And the conflicting public and private health alerts, rather than clarifying the issue, more likely would have confused the public's understanding and made *any* timely response to the emergency more difficult, if not impossible.

We do not mean by this to suggest that the State may *withhold* critical information during an agricultural emergency to suppress public opposition. On the contrary, the Food and Agricultural Code clearly requires full disclosure. (Food & Agr. Code, § 5029.) But it is the *State's* responsibility to design and implement an informational protocol, and that responsibility, as we have seen, cannot as a practical or prudential matter be *divided* during an emergency. When deciding whether to expand a tort duty of care, courts must consider the potential social and economic consequences. (See, e.g., *Huggins* v. *Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 133 [24

Cal.Rptr.2d 587, 862 P.2d 148]; *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 991-994 [25 Cal.Rptr.2d 550, 863 P.2d 795].) As we observed in *Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 146 [271 Cal.Rptr. 146, 793 P.2d 479], "In deciding whether to create new tort duties we have in the past considered the impact that expanded liability would have on activities that are important to society . . . ." A centralized and well-coordinated governmental response to a public emergency is essential to the security and welfare of the citizens of California. The imposition of a private tort duty to warn or otherwise intervene in these circumstances could severely compromise the State's efforts, and thereby place in jeopardy the lives, property, and resources of the citizens of California.

Accordingly, we hold that defendants owed plaintiffs no duty to warn or otherwise interfere with the Medfly eradication project. Summary judgment was therefore properly entered in favor of defendants. We express no opinion, of course, on the merits of plaintiffs' remaining claims against the State and other governmental officials and entities.[10]

## CONCLUSION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I dissent.

Juan ("Johnnie") Macias, a 14-year-old boy who alleged that he became legally blind from exposure to malathion during aerial spraying by the State of California (State), charged that defendant manufacturers and distributors of the pesticide knew the State did not provide complete and accurate health and safety warnings to the public. He contends that defendants had a duty to warn and failed to discharge that duty.

The majority reject the claim, concluding that because the aerial spraying was conducted under the Emergency Services Act (Gov. Code, § 8550), defendants as a matter of law had no duty to undertake any efforts whatever to assure that accurate health warnings reached the public. Indeed, they

---

[10]Because of our conclusion that defendants owed no duty of care to plaintiffs, we need not reach, and do not decide, the subsidiary question whether such a claim would otherwise be preempted by federal law regulating the labeling of insecticides.

characterize possible remedial measures that might have been taken by defendants as inappropriate "second-guess[ing]" of the State and "interfer-[ing] with" its efforts to deal with the emergency caused by the Mediterranean fruit fly infestation. (Maj. opn., *ante*, p. 858].)

To the majority, recognizing a duty to warn on the part of the manufacturers and distributors "contains the seeds of a[ ] . . . disturbing scenario." (Maj. opn., *ante*, p. 859.) As they describe the situation: "In response to the declared emergency, the State here had designed and promulgated a detailed public-outreach program containing, inter alia, certain health information. *Its duty was to convey the most complete and accurate health information practicable to the affected citizens.* [Citation.] It is probably no exaggeration to state that the program's ultimate success depended upon *the public's complete trust and confidence* in the medical information contained in the State's official findings and public pronouncements." (*Ibid.*, italics added.) The majority posit that if the public had also received notices from defendants, the eradication program "might have been fatally compromised." (*Ibid.*) Any intervention by the defendants could have "place[d] in jeopardy the lives, property, and resources of the citizens of California." (*Id.* at p. 860.)

The flaw in the majority's reasoning becomes obvious if we merely look to the allegations in this action, which we must assume to be true for the purposes of review. (Maj. opn., *ante*, p. 847, fn. 1.) The State apparently conformed to the formal statutory protocol for public outreach during a pest eradication project, to the extent of providing some notice to residents and physicians practicing in the area. (Food & Agr. Code, §§ 5771-5778.) The notice provided did not, however, contain a warning of the health and safety precautions that should be taken, despite the statutory requirement that it do so. (*Id.*, § 5775.) The State also failed to comply with the condition of a "special local needs registration" it obtained from the Environmental Protection Agency (EPA), that it give the public prior notification of the precautions listed on the product label.

Thus, the notice disseminated by the State in leaflets and by other media to the public did *not* inform the public that malathion, as described on the EPA label, is "Harmful by swallowing, inhalation or skin contact." It did *not* warn that skin or eyes should be flushed with water if contacted by malathion. Instead, it assured the public there was "No HEALTH HAZARD. . . ." It even affirmatively suggested that contact with the insecticide was innocuous: "in Europe, it is used by physicians to treat head lice in children."

It appears, then, that the State did not meet its duty to "convey the most complete and accurate health information" to the public. Instead, it omitted

health and safety warnings—perhaps in a deliberate effort to allay public anxiety and avoid public opposition to aerial spraying of malathion over residential areas, perhaps through bureaucratic incompetence or mere inadvertence. In so doing, it violated express state and federal requirements. It thereby "placed in jeopardy" if not "the lives, property and resources of the citizens of the California," then at least the eyesight of Johnnie Macias. In these circumstances, I cannot conclude as a matter of law that there was no duty on the part of defendants—who knew that the State's warnings were incomplete and misleading—to take some remedial measures, notwithstanding the declared state of emergency.[1]

In evaluating the scope of a manufacturer's common law duty to warn, numerous courts—including this court—have turned to the factors set forth in section 388 of the Restatement Second of Torts, which relates to the liability of a supplier of a product for negligent failure to warn. Under that section, a manufacturer that supplies a product either directly or through a third party for another's use may be liable to those whom the manufacturer should expect to use the product or be endangered by its probable use, if the manufacturer (1) knows or has reason to know that the product is likely to be dangerous for its intended use; (2) has no reason to believe that those for whose use the product is supplied will realize its dangerous condition; and (3) fails to exercise reasonable care to inform them of its dangerous condition. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64-65 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059] [adopting and applying Rest.2d Torts, § 388, in an action against a drug manufacturer for negligent failure to warn]; accord, *Selma Pressure Treating Co.* v. *Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1621 [271 Cal.Rptr. 596].) "Giving to the third person through whom the [product] is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. . . . The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends on their having it." (Rest.2d Torts, § 388, com. n.) Whether a manufacturer has satisfied its duty to warn the ultimate user (or bystander) by warnings to the immediate purchaser is determined by a rule of reasonableness under the circumstances. (*Persons* v. *Salomon North America, Inc.* (1990) 217 Cal.App.3d 168, 175 [265 Cal.Rptr. 773]; *Adkins* v. *GAF Corp.* (6th Cir. 1991) 923 F.2d 1225, 1231 [actual knowledge of manufacturer

---

[1] It is a gross exaggeration to liken the state of emergency here to the imminent threat of rising floodwaters in an "overburdened reservoir" hypothesized by the majority. (Maj. opn., *ante*, p. 859.) Spraying of malathion in California in response to Mediterranean fruit fly infestations has continued periodically since 1980; it was not a crisis that demanded split-second decisionmaking. In any event, the standard is reasonableness and feasibility under the circumstances. Surely a trier of fact can distinguish between the threat of raging floodwaters and ongoing efforts to eradicate a fly.

"belies any claim of reasonable reliance upon the supposition that since [the intermediary] knew of the hazards of asbestos, it would warn its employees."].) The required balancing of considerations is for the trier of fact unless reasonable minds could not differ.

There is also considerable, and I believe persuasive, case authority holding that private manufacturers have a continuing duty to the public notwithstanding the presence of a *governmental* intermediary with independent statutory responsibilities. (*Reyes* v. *Wyeth Laboratories* (5th Cir. 1974) 498 F.2d 1264; *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121; *Mazur* v. *Merck & Co., Inc.* (3d Cir. 1992) 964 F.2d 1348; *Allison* v. *Merck and Co., Inc.* (1994) 110 Nev. 762 [878 P.2d 948].) These cases hold that the existence of a governmental duty to warn does not displace a manufacturer's common law duty. Thus, *Allison* holds that a drug manufacturer has a duty to warn the ultimate recipients of measles vaccines in a mass immunization effort, notwithstanding the fact that it supplied the product to the Center for Disease Control: " 'We recognize that the government has attempted to statutorily assume . . . the duty to warn the vaccinee, however, we do not find that this . . . thereby relieves the manufacturer from liability for any resulting inadequacy of the warning.' " (878 P.2d at p. 959, quoting *Petty* v. *United States* (8th Cir. 1984) 740 F.2d 1428, 1440.)

No previous case has found that a manufacturer's duty to warn is abrogated simply because a governmental entity has declared a state of emergency. The legislative policy that the majority purport to advance in crafting this new exception to the common law duty to warn is articulated as "provid[ing] the greatest amount of information practicable to affected citizens" during a pest eradication effort. (Food & Agr. Code, § 5029, subd. (b).) I am not persuaded this goal is best served by holding private commercial companies that sell pesticides or other products to the State have no duty to take any remedial action even when they *know* the State is not providing adequate or accurate health and safety information about their products.

To be sure, defendants are not required to "second-guess" or "interfere with" the State's legitimate exercise of its emergency powers. As this case demonstrates, however, the interest in an informed public militates *against* the total abrogation of a defendant's common law duty when it knows that the State is not following legal requirements. In a state of emergency, the possibility of error or miscalculation by an overzealous—or simply uninformed—state official may be magnified. Manufacturers and distributors that know that the State has in fact failed to give adequate notice of public health risks may be in the best position to assure that complete and accurate information is provided. The appropriate standard is one of reasonableness,

and allows any number of steps a manufacturer might reasonably be expected to undertake that would not impede the State's ability to provide clear and adequate public warnings.

Thus, defendants could have contacted the responsible State officials to ensure that they were informed of the situation and hence aware of the need to disseminate different or additional warnings. Alternatively, defendants could have supplied the State with a preprinted flyer or leaflet containing accurate product warnings for mass distribution. (See *Whitehead* v. *St. Joe Lead Co., Inc.* (3d Cir. 1984) 729 F.2d 238, 247; *Macrie* v. *SDS Biotech Corp.* (1993) 267 N.J.Super. 34 [630 A.2d 805, 810-811].) Other cases point to the possibility of contractually obligating an intermediate purchaser to provide accurate instructions or warnings to subsequent users. (See *Donahue* v. *Phillips Petroleum Co.* (8th Cir. 1989) 866 F.2d 1008, 1011 ["Phillips made no effort to discharge its obligation by contracting with its purchaser to ensure that adequate warnings ultimately reach the consumer."]; see also *Bryant* v. *Technical Research Co.* (9th Cir. 1981) 654 F.2d 1337, 1347-1348; *Mazur* v. *Merck & Co., Inc., supra,* 964 F.2d at p. 1365.)

Defendants could also have undertaken reasonable measures to directly inform the public, in advance of aerial spraying, of the true health dangers from exposure to malathion. The court in *Whitehead* refers to inexpensive direct warnings by way of "joint information sessions." (*Whitehead* v. *St. Joe Lead Co., Inc., supra,* 729 F.2d at p. 247.) Similarly, in this case it might have been feasible to hold a press conference, independently or with state officials, to inform the public of the advisability of staying indoors during spraying or, if exposed, of taking the simple precautions of promptly washing malathion spray from the skin or eyes and contacting a physician if irritation from exposure to the skin or eyes persisted.

Contrary to the vision of "complete chaos" conjured by the majority (maj. opn., *ante,* p. 859), reasonable measures of this kind were unlikely to have interfered with the State's ability to carry out an effective eradication program or its obligation to provide clear and effective warnings to the public *of the very same health risks.* They would, on the contrary, be fully consistent with the legislative intent to provide affected citizens with the "greatest amount of information practicable." (Food & Agr. Code, § 5029, subd. (b).) Of course, it is for the trier of fact to determine, in light of all the evidence, whether these or other measures were feasible and reasonable under the totality of the circumstances.

In my view, the question whether defendants' conduct satisfied their common law duty to provide reasonable warnings in light of all the circumstances turns on disputed issues of fact.[2] Accordingly, the matter could not properly be resolved on summary judgment. I would affirm the judgment of the Court of Appeal.

---

[2] I would also hold that because plaintiffs' failure-to-warn claim is not predicated on any alleged deficiency in the EPA-approved labeling, it is not preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136v(b)). (See *Macrie v. SDS Biotech Corp.*, *supra*, 630 A.2d at p. 813 [summary judgment could not be sustained on the basis of federal preemption: "consistently with FIFRA, State law may require a pesticide manufacturer like defendant to take reasonable steps, either through instructions to its customers or directly through its own efforts, to assure that persons, like plaintiffs, . . . will be warned of [the pesticide's] dangers"]; *New York State Pesticide Coalition v. Jorling* (2d Cir. 1989) 874 F.2d 115.)