[No. B209854. Second Dist., Div. Six. June 21, 2010.]

LEROY MYRICK et al., Plaintiffs and Respondents, v.
MARY MASTAGNI, as Trustee, etc., et al., Defendants and Appellants.

## COUNSEL

Brown, Brown & Klass, Delos E. Brown, Robert L. Kaufman and John J. Stumreiter for Defendants and Appellants.

Castro & Associates, Joel B. Castro, Ruth Scott; Hinshaw & Culbertson, John W. Sheller and Wendy W. Chang for Plaintiffs and Respondents.

## OPINION

**GILBERT, P. J.**—Here we decide two distinct issues and conclude: A city ordinance requiring hazardous buildings to be retrofitted by a certain date does not insulate owners of unreinforced masonry buildings from liability for negligence causing death or injuries prior to the compliance date.

 Civil Code sections 1431.1 and 1431.2, which limit a defendant's tort liability for noneconomic damages, do not apply to defendants in a joint venture. Defendants in a joint venture are jointly and severally liable for noneconomic damages, whatever their respective interests in the joint venture.

This case arises from the death of two women who were killed in 2003, when a portion of a building collapsed on them during an earthquake. The women's survivors sued the building's owners for negligence in failing to perform seismic retrofitting of the building. The jury found the owners negligent and awarded substantial damages. The jury also found the owners were members of a joint venture in the ownership and maintenance of the building. The judgment made defendant owners jointly and severally liable.

 On appeal, defendants contend they had no duty to retrofit the building until 2018, the deadline established by city ordinance. They also contend the court erred in making them jointly and severally liable. We affirm.

## FACTS

On the morning of December 22, 2003, Jennifer Lynn Myrick and Marilyn Frost-Zafuto were at work at a clothing store in downtown Paso Robles. The building in which they worked was a 111-year-old unreinforced masonry structure, known as the "Acorn Building." About 11:00 a.m., the San Simeon earthquake struck. When the shaking began, Myrick and Frost-Zafuto fled the building to the street. Instead of finding safety there, however, they were killed when a portion of the building collapsed, crushing them.

Between 1989 and 1992, the city had retained a consultant to inventory the unreinforced masonry buildings within its jurisdiction. The inventory was conducted pursuant to Government Code section 8875.2, subdivision (a). That subdivision requires local building departments to identify buildings that are potentially hazardous during an earthquake. Subdivision (b) of the section requires local governments to establish a mitigation program that includes notification to the buildings' owners. The city identified the Acorn Building as potentially hazardous and sent notice to the building's owners in December 1989.

As part of the mitigation program, the city enacted an ordinance in November 1992. The ordinance required owners of unreinforced masonry buildings to retrofit them to comply with earthquake safety standards. The ordinance specified that the owners must comply within 15 years from the date of official notice. The city notified the owners of the Acorn Building of the retrofit requirement on November 5, 1993. The city amended the ordinance in 1998 to extend the deadline for compliance to 2018.

On October 28, 1998, the city and the Acorn Building's owners entered into an agreement with structural engineer Robert F. Alderman. Alderman agreed to prepare a seismic structural design study of the Acorn Building to determine what structural improvements are necessary to bring the building into compliance with the city's remediation ordinance. Alderman prepared and delivered his report to the city and the building's owners. The report identified various seismic deficiencies and contained plans to retrofit the building to make it comply with the city's ordinance. Nevertheless, the building's owners did not complete the seismic retrofitting prior to the earthquake.

The survivors of Myrick and Frost-Zafuto (hereafter collectively Myrick) brought a wrongful death action against the building's owners. The action was based on general negligence.

*Building Owners*

Mary and Armand Mastagni purchased the Acorn Building in 1973. In 1995, Armand suffered a series of strokes. The Mastagnis transferred the building to a living trust of which they were both trustees. Prior to the time Armand became ill, he and Mary jointly managed the building. After Armand became ill, Mary took over management as trustee. Nevertheless, until Armand's death, they continued to discuss everything together including "management issues on the Acorn Building."

At the end of 1995, Armand and Mary executed deeds as individuals intending to transfer a 3 percent interest in the building to the Mastagni children's trust. The three Mastagni children were cotrustees of that trust.

Armand died in 1997. The assets of the Mastagni living trust were transferred to the Mastagni survivor trust. Mary is trustee of the survivor trust.

Thereafter, Mary executed a number of leases for retail stores in the Acorn Building. She executed the leases both as trustee of the survivor trust and on behalf of the children's trust. In addition, the children received tax documents purporting to reflect income or loss from the children's trust. The documents showed no taxable income. Mary claimed only 97 percent of the income as hers on her tax returns. She testified she did not know who claimed the other 3 percent.

In August 2003, Mary formed a limited liability company (LLC) to manage the Acorn Building. By the time of the earthquake, no transfer of property into the LLC had taken place.

*Special Verdict and Judgment*

The jury awarded $1.2 million in the death of Jennifer Lynn Myrick and $700,000 in the death of Marilyn Frost-Zafuto against all defendants. All damages are noneconomic. The judgment provides for joint and several liability.

The jury found that Mary was acting as the agent for the living trust, the survivor's trust, the children's trust and the LLC in the operation and management of the Acorn Building. The jury also found that Mary, Armand, the living trust, the survivor's trust, the children's trust and the LLC were involved in a joint venture for the ownership, management, operation or maintenance of the Acorn Building.

## DISCUSSION

### I

Mastagni[1] contends the trial court erred in refusing to rule that as a matter of law she had no duty to retrofit until 2018, the deadline established by ordinance.

■ The basic rule of tort liability for property owners is that an owner must use ordinary care in the management of his or her property to prevent injury to another. (Civ. Code, § 1714.) The test is whether an owner has acted as a reasonable person in view of the probability of injury. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561].)

■ Generally courts have not looked favorably on the use of statutory compliance as a defense to tort liability. (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 547–548 [25 Cal.Rptr.2d 97, 863 P.2d 167].) That is because a statute, ordinance or regulation ordinarily defines a minimum standard of conduct. (*Id.* at p. 548.) A minimum standard of conduct does not preclude a finding that a reasonable person would have taken additional precautions under the circumstances. (*Ibid.*) Nevertheless, where the evidence shows no unusual circumstances statutory compliance may be accepted by the trier of fact, or by the court as a matter of law, as sufficient. (*Ibid.*)

Here the trial court allowed the jury to consider the ordinance in determining whether Mastagni was negligent. But Mastagni claims the court should have ruled as a matter of law that her duty was limited to compliance with the ordinance.

Mastagni relies on cases that are easily distinguished. In *Ramirez v. Plough, Inc., supra,* 6 Cal.4th 539, the question was whether a pharmaceutical manufacturer was negligent in not providing warnings in Spanish, as well as

---

[1] Appellants are collectively "Mastagni."

English. In concluding as a matter of law that the manufacturer was not required to issue warnings in a language other than English, the court relied on state and federal statutory and administrative law. The court pointed out that the federal Food and Drug Administration (FDA) not only specifies the subject matter of the warnings, but the actual words to be used. (*Id.* at p. 549.) The FDA regulations require only English labeling. (*Id.* at p. 550.) The court also noted that California law reinforces federal regulations and only requires drug warnings to be in English. (*Ibid.*, citing Health & Saf. Code, former § 25900.) The court pointed out that in dealing with other matters the Legislature has expressly required that written materials be in languages other than English. (6 Cal.4th at pp. 550–551.) The court noted that in defining the circumstances under which a foreign language must be used, the Legislature has "drawn clear lines." (*Id.* at p. 551.)

Unlike pharmaceutical manufacturing and marketing considered in *Ramirez,* seismic retrofitting is not the subject matter of complex federal regulations. The Paso Robles City Council, deciding a date for compliance, is simply not the equivalent in terms of experience or expertise of a federal administrative agency regulating the arcane subject matter of pharmaceuticals. Moreover, unlike for the use of languages other than English, the California Legislature has not drawn clear lines for setting a seismic retrofitting compliance date. Indeed, the California Legislature does not even require seismic retrofitting. Government Code section 8875.2, subdivision (b) provides that the local investigation program "may" include measures to strengthen buildings.

In *Southern California Regional Rail Authority v. Superior Court* (2008) 163 Cal.App.4th 712 [77 Cal.Rptr.3d 765] (*Regional Rail*), passengers injured or killed in a derailment alleged the railroad was negligent in operating its train in the "push mode," that is, with the locomotive in the rear. The court concluded that federal railroad safety regulations preempted plaintiffs' state law claims of negligence. (*Id.* at p. 734.) Here we are not concerned with preemption of the city's ordinance by federal regulations.

In *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465 [110 Cal.Rptr.2d 370, 28 P.3d 116], the plaintiffs were victims of a shooting rampage carried out by a deranged gunman. The plaintiffs brought a negligence action against the manufacturer of the guns used in the shooting. They alleged the manufacturer was negligent in making and marketing certain guns for sale to the general public. The plaintiffs asserted the manufacturer knew or should have known

the guns in question have no legitimate purpose. Our Supreme Court determined that the plaintiffs' action was essentially a products liability action barred by Civil Code former section 1714.4. Subdivision (a) of that section provided: "In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged." (Repealed by Stats. 2002, ch. 906, § 2 & ch. 913, § 2.)

Civil Code former section 1714.4, as interpreted by *Merrill*, barred a gun manufacturer's tort liability by disallowing a cause of action no matter what the theory. The ordinance here does not purport to bar Myrick's negligence cause of action.

In *Macias v. State of California* (1995) 10 Cal.4th 844 [42 Cal.Rptr.2d 592, 897 P.2d 530], the Governor declared a state of emergency authorizing the helicopter spraying of insecticide to control a fruit fly infestation. The plaintiff, who claimed to have been injured by contact with the insecticide spray, sued the manufacturers and distributors. He alleged that the manufacturers and distributors had a duty to warn the public after they became aware of alleged deficiencies in the state's warnings. The court held they had no such duty. In so holding, the court stated: "[T]o impose a common law duty to intervene in a declared state of emergency would represent an unprecedented intrusion on the State's police power to protect the citizens and economy of California in times of extreme peril. To authorize, indeed to compel, a party to undermine the public health warnings promulgated and published by the State under a specific statutory mandate could severely compromise the government's ability to respond effectively to the emergency." (*Id.* at p. 847.)

The instant case does not concern the duty to intervene in an officially declared emergency. Here there was no such declared emergency. In fact, far from treating seismic retrofitting as an emergency, the city extended the time for compliance to 2018.

Mastagni argues the ordinance reflects a balance of safety, community interests and cost. Thus she believed it reflects a legislative determination of what was reasonable. Legislation usually does reflect a balance of interests. Yet, the general rule is that statutory compliance is not a complete defense in a tort action. (See *Ramirez v. Plough, Inc., supra,* 6 Cal.4th at pp. 547–548

["Courts have generally not looked with favor upon the use of statutory compliance as a defense to tort liability."].)

Mastagni presents no compelling reason for departing from the general rule in this case. The question of tort liability here is not enmeshed in a web of federal regulations, as in *Ramirez* and *Regional Rail*. Nor does the ordinance here speak directly to tort liability by purporting to bar a particular cause of action, as in *Merrill*. Nor is this a question of the duty to intervene in an officially declared emergency, as in *Macias*.

Certainly, the city considered the interests of building owners in setting the deadline for compliance. But the overriding policy behind the seismic retrofit ordinance, taken as a whole, is not the promotion of the interests of building owners. Instead, the overriding policy is public safety. Former section 17.18.010 of the El Paso de Robles Municipal Code provided in part: "The purpose of this chapter is to promote public safety and welfare by reducing the risk of death or injury that may result from the effects of earthquakes on existing unreinforced masonry bearing wall buildings." Former section 17.18.030 of the municipal code stated that full compliance must have been completed "[w]ithin" the deadline. Nothing in former chapter 17.18 of the municipal code prohibited or even discouraged earlier compliance. Instead, earlier compliance promoted the overriding public safety policy. To hold that as a matter of law a building owner has no duty until after the compliance date of a code provision would frustrate the very policy that the provision was designed to promote.

## II

Mastagni contends the trial court erred in making defendants jointly and severally liable.

Mastagni points out that all damages awarded here are noneconomic. Civil Code section 1431.2, subdivision (a) provides in part, "liability of each defendant for non-economic damages shall be several only and shall not be joint." Section 1431.2 applies only to the doctrine of joint and several liability. (See *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 83 [11 Cal.Rptr.2d 454].) It does not apply, for example, to the vicarious liability of an employer under the doctrine of respondeat superior for noneconomic damages caused by the negligence of an employee. (*Ibid.*)

It is true the jury attributed the following percentages of responsibility to each defendant: 30 percent to Mary; 25 percent to Armand; 10 percent to the living trust; 10 percent to the survivor's trust; 20 percent to the children's trust; and 5 percent to the LLC. It attributed no responsibility to Jennifer Lynn Myrick or Marilyn Frost-Zafuto.

■ But the jury found that defendants are parties to a joint venture. The incidents of a joint venture are in all important respects the same as those of a partnership. (9 Witkin, Summary of Cal. Law (10th ed. 2005) Partnership, § 9, p. 584.) One such incident of partnership is that all partners are jointly and severally liable for partnership obligations, irrespective of their individual partnership interests. (*Id.*, § 39, p. 613.) Because joint and several liability arises from the partnership or joint venture, Civil Code section 1431.2 is not applicable.

Mastagni does not contest that Civil Code section 1431.2 is inapplicable to liabilities of a joint venture. She argues, however, that there is insufficient evidence to support the jury's finding of a joint venture. Specifically, she claims there is no evidence to support the required element that each member of a joint venture have an ownership interest in the enterprise.

Mastagni relies on *Jeld-Wen, Inc. v. Superior Court* (2005) 131 Cal.App.4th 853 [32 Cal.Rptr.3d 351]. There, Jeld-Wen leased a truck from Penske. The plaintiffs' decedent was killed when he was hit by the truck driven by a Jeld-Wen employee. The plaintiffs sued Penske, claiming that the truck leasing company was in a joint venture with Jeld-Wen. The court stated the elements of a joint venture as " 'the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise.' " (*Id.* at p. 872, quoting *Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666 [60 Cal.Rptr.2d 179].) In holding that as a matter of law Jeld-Wen and Penske were not in a joint venture, the court stated, "The only business relationship Penske had with [Jeld-Wen], as shown by the evidence, was the leasing of its truck, and no more is shown than that each only had an interest in its own business operations." (*Jeld-Wen*, at p. 873.)

It should be obvious that a truck leasing company is not in a joint venture with everyone to whom it leases a truck. Because the only relationship between Jeld-Wen and Penske was a truck lease, they were obviously not in a joint venture.

The situation here is quite different. Each of the defendants had an interest in the operation of the Acorn Building as a business. Armand and Mary were owners and managers; the family trust and survivor's trust were successive

owners and operators of the building; the children's trust was treated as an owner; it executed leases and received income statements for tax purposes; and the LLC was formed to own and manage the building. There is more than ample evidence to support the jury's finding of a joint venture.

Mastagni argues that the jury instruction on joint venture was wrong in that it did not include "ownership interest" as an element. (See CACI No. 3712.)[2] But even if the instruction is in error, the error is harmless. The most reasonable conclusion from the evidence leads to a finding of a joint venture. Mastagni has failed to carry her burden of showing a reasonable probability she would have obtained a more favorable result in the absence of the alleged error. (See *Thomas v. Lusk* (1994) 27 Cal.App.4th 1709, 1720 [34 Cal.Rptr.2d 265].)

Mastagni argues without citation to authority that under the partnership law as it existed at the time of Armand's death, the joint venture ended when he died. Assuming Mastagni is correct about partnership law as it existed at the time of Armand's death, she is not helped.

Armand was not a defendant in the action. But, except for the LLC, all defendants were members of a joint venture both with Armand and after he died. Thus, even viewed as a succession of joint venture, all defendants, except for the LLC, were members of both joint ventures and are jointly liable. The LLC was not formed until after Armand's death. Nevertheless, because the LLC was a member of the present joint venture with all other defendants, all defendants are jointly liable for the LLC's negligence.

Mastagni points out that the verdict form shows the jury determined Mary was 30 percent responsible for plaintiffs' deaths. The jury found the trusts and the LLC 45 percent responsible. Mastagni argues the trusts and the LLC cannot be liable for more than Mary because they were not tortfeasors. Mary claims the trusts and the LLC were only found vicariously liable.

But the verdict form simply asks, "[W]hat percentage of responsibility for [plaintiffs'] death[s] do you attribute to the following?" There follows a list that includes Armand and each of the defendants. The form does not ask the jury to distinguish between direct and vicarious liability, and there is no reason to believe they did so. The jury however found there to be a joint venture. In light of that finding, these percentages have no significance.

---

[2] CACI No. 3712 states, "A joint venture and each of its members are responsible for the wrongful conduct of a member acting within the scope of his or her authority. [¶] You must decide whether a joint venture existed in this case. A joint venture exists when two or more persons combine their property, skill, or knowledge to carry out a single business undertaking and agree to share the control, profits, and losses. A joint venture can be formed by a written or oral agreement or by an agreement implied by the parties' conduct."

What the jurors must have understood are these simple facts: they were allocating 100 percent of the responsibility for the deaths to Armand and defendants; they were allocating no responsibility to plaintiffs' decedents; and they were finding Armand and all defendants to be joint venturers. The only reasonable conclusion from the jury's findings is that all defendants are jointly and severally liable.

The judgment is affirmed. Costs are awarded to respondents.

Yegan, J., and Perren, J., concurred.

A petition for a rehearing was denied July 16, 2010, and appellants' petition for review by the Supreme Court was denied September 15, 2010, S185054.