[No. C055327. Third Dist. June 4, 2008.]

CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION et al., Plaintiffs and Respondents, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Appellants.

## Counsel

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Teri L. Block, Jonathan K. Renner, Thomas M. Patton, Vickie Pochelle Whitney and Stacy Boulware Eurie, Deputy Attorneys General, for Defendants and Appellants.

Gibson, Dunn & Crutcher, Daniel M. Kolkey and Rebecca Justice Lazarus for Corrections Corporation of America as Amicus Curiae on behalf of Defendants and Appellants.

Reed Smith and Paul D. Fogel for The GEO Group, Inc., as Amicus Curiae on behalf of Defendants and Appellants.

Nielsen, Merksamer, Parrinello, Mueller & Naylor, Steven A. Merksamer, Richard D. Martland and Kurt R. Oneto for George Deukmejian, Pete Wilson and Gray Davis as Amici Curiae on behalf of Defendants and Appellants.

Carroll, Burdick & McDonough, Ronald Yank, Laurie Hepler, Gregg McLean Adam, Jennifer S. Stoughton; Benjamin C. Sybesma and Christine Albertine for Plaintiff and Respondent California Correctional Peace Officers Association.

Paul E. Harris III and Anne M. Giese for Plaintiff and Respondent Service Employees International Union, Local 1000.

## Opinion

**SCOTLAND, P. J.**—In October 2005, California's prison system reached a milestone that its facilities were ill equipped to handle. Prison inmates numbered 166,148, a historic high greatly exceeding the capacity for which the prisons were designed. It is undisputed that severe overcrowding of state prisons posed a serious threat to the health and safety of inmates, correctional officers, and the general public because it (1) heightened the risk of inmate violence against other inmates and prison staff, (2) caused power failures that jeopardized prison security, (3) resulted in sewage spills and environmental contamination that polluted groundwater and increased the risk of the transmission of infectious illnesses, and (4) required the early release of offenders from county jails because of the inability of California's Department of Corrections and Rehabilitation (CDCR) to expeditiously move inmates from jails to state prisons.

After the Legislature rejected his proposals to deal with the problem, Governor Arnold Schwarzenegger called a special session of the Legislature to "address this crisis." However, the Legislature adjourned without taking any remedial action.

Invoking the California Emergency Services Act (Gov. Code, § 8550 et seq.), the Governor declared a prison overcrowding state of emergency and then authorized the CDCR to contract with out-of-state private prisons to house some of California's inmates.[1]

The California Correctional Peace Officers Association (CCPOA) and other plaintiffs filed a petition for writ of mandate and complaint for declaratory and injunctive relief, seeking (1) a declaration that the prison overcrowding emergency proclamation was not authorized by the Emergency Services Act or any other law, and that the contracts signed pursuant to the proclamation violate the civil service mandate of the California Constitution (Cal. Const., art. VII, § 1, subd. (a)), and (2) an injunction prohibiting the Governor "from issuing any further orders under the ostensible authority of his Proclamation," enjoining defendants from performing "any inmate transfer contract signed pursuant to the Governor's Proclamation" and from "[e]ntering into any other similar contracts," and prohibiting the expenditure of "any State funds pursuant to the existing inmate transfer contracts."

After a hearing, the trial court entered a judgment against the Governor and other defendants (1) declaring the Governor's state of emergency proclamation is "unlawful," (2) declaring the contracts entered into pursuant to the proclamation "are unauthorized by the Emergency Services Act or any other law, and violate Article VII of the California Constitution," (3) issuing a writ of mandate "ordering and commanding Defendant . . . ARNOLD SCHWARZENEGGER to perform all acts necessary to revoke the 'Proclamation of a Prison Overcrowding State of Emergency' dated October 4, 2006," and further "command[ing] SCHWARZENEGGER to file a return within 30 days, setting forth what he has done to comply with the Writ," (4) permanently enjoining defendants "from performing—whether by payment of money, transfer of inmates out of the State's custody, or in any other respect—any inmate-transfer contracts signed pursuant to the Governor's Proclamation," and (5) awarding plaintiffs their costs of bringing the lawsuit.

■ We granted appellants' petition for writ of supersedeas and stayed the judgment pending the decision in this appeal. We shall now reverse the judgment. As we will explain, the Governor did not exceed his powers in

---

[1] We hereafter will refer to the California Emergency Services Act as either the Emergency Services Act or simply the Act.

declaring a state of emergency based on prison overcrowding, and CDCR's contracts with out-of-state private prisons do not violate article VII of California's Constitution.

## FACTUAL BACKGROUND

In October 2005, the director of CDCR's division of adult institutions advised the Secretary of CDCR that a "population crisis" was occurring in the state prison system and "immediate action" was required because the "historic population high" of over 166,000 inmates in state prison facilities posed "an imminent and substantial threat to the public safety" for "the CDCR as well as the counties of our State."

In January 2006 and March 2006, Governor Schwarzenegger proposed legislation to rectify the problem, but the Legislature rejected the measures. Because "urgent action was needed to address this severe problem in California's prisons, and [he] wanted to give the Legislature a further opportunity to address this crisis," the Governor called a special session of the Legislature in June 2006. However, the Legislature adjourned without taking remedial action.

Consequently, invoking the Emergency Services Act on October 4, 2006, the Governor issued a "Prison Overcrowding State of Emergency Proclamation," finding that "all 33 CDCR prisons [were] at or above maximum operational capacity, and 29 of the prisons [were] so overcrowded that the CDCR [was] required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks."

Specifically, the Governor's proclamation found that the severe prison overcrowding "caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them" because, with so many inmates housed together in triple bunks in large common areas, there existed "an increased, substantial risk of violence"; "an increased, substantial risk for transmission of infectious illnesses"; and "an increased, substantial security risk" due to "line-of-sight problems for correctional officers" created by "triple-bunks and tight quarters."

The proclamation further found that there was "an increased, substantial risk to the health and safety of CDCR staff, inmates, and the public" because the severe overcrowding caused electrical and wastewater systems to operate at or above maximum capacity, resulting in (1) "power failures and blackouts

within the prisons" that "increased security threats," and (2) "the discharge of waste beyond treatment capacity, resulting in thousands of gallons of sewage spills" that caused "environmental pollution" and "groundwater contamination" which could affect "the drinking water supply, putting the public's health at an increased, substantial risk."

To address this "extreme peril to the safety of persons and property," the Governor's proclamation directed CDCR to negotiate contracts for the transfer and housing of inmates in facilities outside of the state.

Accordingly, CDCR contracted with The GEO Group, Inc., and Corrections Corporation of America to house California inmates. The contracts are for a term of three years, but the number of beds covered by the contract can be reduced or the contract terminated if other solutions materialize before the contracts expire.

CCPOA and other plaintiffs, whom we will refer to collectively as CCPOA, responded by filing a petition for writ of mandate and complaint for declaratory and injunctive relief. CCPOA did not dispute the facts stated in the Governor's proclamation; rather, it argued that "even under the facts as asserted in SCHWARZENEGGER'S Proclamation," the Governor "had no statutory authority" to declare a prison overcrowding emergency, and the contracts to house prisoners in out-of-state institutions were unconstitutional. CCPOA claimed the proclamation was not authorized by the Emergency Services Act because, in CCPOA's view, the Act is designed to address emergencies suffered by local governments, not emergencies suffered by state agencies or occurring solely on state-controlled property. CCPOA also argued there was no showing that the emergency required the combined forces of a mutual aid region or regions. In addition, CCPOA asserted the contracts violated the civil service mandate of article VII of California's Constitution.

The trial court held that although "[p]rison overcrowding in California is a crisis creating conditions of extreme peril to the safety of persons and property within the state, which are or likely will be beyond the control of any single county or city in California," it is not "covered by the California Emergency Services Act" because the emergency was "due to circumstances which are ordinarily under the control of the state government as opposed to local government." In the trial court's view, "because control of the state prisons is exclusively within the purview of state government and not local government," it cannot be inferred that "the combined services of a mutual aid region or regions [will be required] to combat this emergency," regardless of the "magnitude of the crisis." This holding was based upon the trial court's conclusion that "[t]he intent of the Emergency Services Act is not to give the Governor extraordinary powers to act without legislative approval in matters

such as this that are ordinarily and entirely within the control of state government." The trial court further held that, even if the Governor's emergency proclamation did not violate the Emergency Services Act, "the contracts to send some state prisoners to out of state private facilities are illegal because they violate the civil service principles founded [*sic*] in the California Constitution, Article VII," which preclude contracting out jobs that are typically performed by civil service employees.

Accordingly, the trial court entered a judgment declaring the proclamation and resulting contracts to be unlawful, enjoining the performance of such contracts and the issuance of other orders pursuant to the proclamation, and awarding costs to CCPOA.

## DISCUSSION

### I

To determine whether the state prison overcrowding emergency proclamation exceeded the Governor's authority under the Emergency Services Act, we begin by examining the provisions of the Act.

■■ The Emergency Services Act endows the Governor with the power to declare a state of emergency "in conditions of . . . extreme peril to life, property, and the resources of the state" so as to "mitigate the effects of [the emergency]" in order to "protect the health and safety and preserve the lives and property of the people of the state." (Gov. Code, § 8550.) The Act confers upon the Governor broad powers to deal with such emergencies. (Gov. Code, § 8550.) After declaring a state of emergency, the Governor may, for example, suspend any regulatory statute or the orders, rules, or regulations of any state agency if they would "prevent, hinder, or delay the mitigation of the effects of the emergency." (Gov. Code, § 8571.) The Governor also may commandeer or use any private property or personnel deemed necessary to carry out his responsibilities (Gov. Code, § 8572) and make expenditures from any fund "legally available . . . to deal with actual or threatened conditions of a . . . state of emergency . . ." (Gov. Code, § 8645).

■■ A "primary purpose[]" of the Act "is to ensure that 'all emergency services functions' of the State and local governments, the federal government, and 'private agencies of every type,' 'be coordinated . . . to the end that the most effective use be made of all manpower, resources, and facilities for dealing with any emergency that may occur.' (Gov. Code, § 8550.) To further that end, the Governor is charged with the responsibility to coordinate the emergency plans and programs of all local agencies, 'such plans and programs to be integrated into and coordinated with the State Emergency Plan

and the plans and programs of the federal government and of other states to the fullest possible extent.' (Gov. Code, § 8569.)" (*Macias v. State of California* (1995) 10 Cal.4th 844, 854 [42 Cal.Rptr.2d 592, 897 P.2d 530].)

■ "Thus, the Emergency Services Act makes clear that in situations of 'extreme peril' to the public welfare the State may exercise its sovereign authority to the fullest extent possible consistent with individual rights and liberties. . . . 'The [act] recognizes and responds to a fundamental role of government to provide broad state services in the event of emergencies resulting from conditions of disaster or of extreme peril to life, property, and the resources of the state. Its purpose is to protect and preserve health, safety, life, and property.' The act makes equally evident the overriding necessity of a broadly *coordinated* effort to deal with emergencies, and places the primary responsibility, and the means for carrying out such efforts, with the State." (*Macias v. State of California, supra,* 10 Cal.4th at p. 854, original italics, quoting *Martin v. Municipal Court* (1983) 148 Cal.App.3d 693, 696 [196 Cal.Rptr. 218].)

The Governor's power to proclaim a state of emergency emanates from Government Code section 8625, which provides: "The Governor is hereby empowered to proclaim a state of emergency in an area affected or likely to be affected thereby when: [¶] (a) He finds that circumstances described in subdivision (b) of Section 8558 exist; and either [¶] (b) He is requested to do so (1) in the case of a city by the mayor or chief executive, (2) in the case of a county by the chairman of the board of supervisors or the county administrative officer; or [¶] (c) He finds that local authority is inadequate to cope with the emergency." (Further section references are to the Government Code unless otherwise specified.)

Subdivision (b) of section 8558 defines the circumstances that must exist in order for the Governor to proclaim a state of emergency. " 'State of emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property within the state caused by such conditions as air pollution, fire, flood, storm, epidemic, riot, drought, sudden and severe energy shortage, plant or animal infestation or disease, the Governor's warning of an earthquake or volcanic prediction, or an earthquake, or other conditions, other than conditions resulting from a labor controversy or conditions causing a 'state of war emergency,' which, by reason of their magnitude, are or are likely to be beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat, or with respect to regulated energy utilities, a sudden and severe energy shortage requires extraordinary measures beyond the authority vested in the California Public Utilities Commission." (§ 8558, subd. (b).)

■ Accordingly, as we will explain, the Governor may proclaim a state of emergency when a condition of extreme peril to the safety of persons and property exists "within the state," even in an area under the exclusive control of the state government, and because of its magnitude, the condition is likely to affect areas within the jurisdiction of local government; is likely to be beyond the control of the services, personnel, equipment, and facilities of any single county or city; and is likely to require the combined forces of a mutual aid region or regions to combat. (§ 8558, subd. (b).)

The Emergency Services Act does not define "mutual aid," but its meaning is evident from the purpose of the statutory scheme and in the California Disaster and Civil Defense Master Mutual Aid Agreement (MMAA), which was executed in November 1950 by Governor Earl Warren on behalf of the State of California and all its departments and agencies, by all 58 counties, and by most cities. The MMAA created a formal structure whereby each jurisdiction can retain control of its personnel and facilities but can still give or receive help whenever needed. This mutual aid system ensures that "all of the resources and facilities of the State, its various departments and agencies, and all its political subdivisions, municipal corporations, and other public agencies be made available to prevent and combat the effect of disasters" and be "available and furnished" in "all cases in which a *STATE OF EXTREME EMERGENCY* has been proclaimed." (Original italics.)

■ Simply stated, mutual aid is the coordination and utilization of the multiple resources of state and local government to address a disaster or other state of emergency.[2]

■ "A 'mutual aid region' is a subdivision of the state emergency services organization, established to facilitate the coordination of mutual aid and other emergency operations within an area of the state consisting of two or more county operational areas." (§ 8559, subd. (a).) The State of California is divided into six mutual aid regions to enable the most effective application, administration, and coordination of mutual aid and other emergency-related activities. (Governor's Off. of Emergency Services, Emergency Management in California, *supra*, at pp. 10–11.)

---

[2] A document entitled Emergency Management in California, published by the Governor's Office of Emergency Services in 2003, describes mutual aid as a "concept of resource sharing in which similar organizations assist each other during emergencies . . . ." (Governor's Off. of Emergency Services, Emergency Management in California (Oct. 2003) p. 8.) It further describes California's mutual aid system as an "integral part" of a standardized emergency management system "using the 'neighbor helping neighbor' concept whenever a jurisdiction's own resources may be inadequate to cope with a given situation." (*Id.* at pp. 7, 11.)

## II

■ Contrary to the trial court's ruling, the stated purpose of the Emergency Services Act and the language of section 8558, subdivision (b) do not exclude from the definition of a "state of emergency" a condition of peril to the safety of persons and property simply because it exists in an area that is, as the trial court put it, exclusively within the purview of state government. The Act explicitly applies not just to a " '[l]ocal emergency,' " which is one "within the territorial limits of a county, city and county, or city" (§ 8558, subd. (c)), but also to an emergency that exists "within the state" (§ 8558, subd. (b)), which includes an area within the exclusive control of state government.

Thus, for example, if a fire is raging out of control in a state park and threatens to spread in a manner that poses extreme peril to the safety of persons and property outside the park, the Governor is not precluded from proclaiming a state of emergency simply because the condition exists on land within the purview of state government, not local government.

■ The issue then is not whether the condition is in an area under the exclusive control of the state, but whether it poses an extreme peril to the safety of people and property that, because of its magnitude, is or is "likely to [(1)] be beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and [(2)] require the combined forces of a mutual aid region or regions to combat" (§ 8558, subd. (b)).[3] Whether the condition of such peril in an area under the exclusive control of the state is likely to require the combined forces of a mutual aid region or regions to combat will ordinarily turn on whether it is likely the condition will affect an area within the jurisdiction of local government (§ 8625) and whether it is likely that local resources as well as state resources will be needed to combat the condition.

■ CCPOA makes an unpersuasive argument that the language of section 8625 demonstrates that a state of emergency cannot apply to a

---

[3] CCPOA asserts that to satisfy section 8558, subdivision (b), it must be shown that emergency conditions *will require* the combined forces of a mutual aid region or regions, not just be *likely to require* such assistance to combat the conditions. This is a grammatically incorrect reading of the statute, which provides in pertinent part: " 'State of emergency' means . . . conditions of disaster or of extreme peril to the safety of persons and property . . . which, by reason of their magnitude, are or are likely to be beyond the control of [a single local government's resources] and require the combined forces of a mutual aid region or regions to combat . . . ." (*Ibid.*) Elementary rules of grammar and sentence structure lead to the conclusion that the words "are or are likely to" modify both requisites, i.e., the emergency conditions are or are likely to be beyond the control of one local government's resources and are or are likely to require the combined forces of a mutual aid region or regions to combat the conditions.

condition of extreme peril in an area under the exclusive control of state government. Section 8625 says that when the Governor finds that circumstances described in subdivision (b) of section 8558 exist, the Governor "is hereby empowered to proclaim a state of emergency in an area affected or likely to be affected thereby when: [¶] . . . [¶] (b) He is requested to do so (1) in the case of a city by the mayor or chief executive, (2) in the case of a county by the chairman of the board of supervisors or the county administrative officer; or [¶] (c) He finds that local authority is inadequate to cope with the emergency." In CCPOA's words, "[t]hese alternative requirements confirm that the Legislature had in mind emergencies that local governments would typically address, but that are too large for any one of them to handle effectively." However, the provisions of section 8625 do not support CCPOA's conclusion because the statute logically applies when an area within a local government's jurisdiction is "likely to be affected" by an emergency condition in an area under the exclusive control of the state. (§ 8625.) In that circumstance, the local government may request a state of emergency or, absent such a request, the Governor may proclaim one if the "local authority is inadequate to cope with the emergency." (*Ibid.*) Moreover, as we have already pointed out, CCPOA's analysis ignores the plain and unambiguous language of section 8558, subdivision (b), which defines a state of emergency to include a qualifying condition that exists "within the state," not just within the territorial limits of a county or city.

▮ Also without merit is CCPOA's argument based on the language of section 8628, which provides: "During a state of emergency the Governor may direct all agencies of the state government to utilize and employ state personnel, equipment, and facilities for the performance of any and all activities designed to prevent or alleviate actual and threatened damage due to the emergency; and he *may direct such agencies to provide supplemental services and equipment to political subdivisions to restore any services which must be restored in order to provide for the health and safety of the citizens of the affected area. . . .*" (Italics added.) In CCPOA's words, the language italicized above "demonstrates that what the Act means by 'state of emergency' is a disaster affecting a particular 'area'—not a persistent crisis throughout the whole state—that requires temporary supplemental assistance from state agencies to 'political subdivisions.' " Not so. The purpose of section 8628 is to authorize, during a state of emergency, the use of services and equipment of the state to perform tasks ordinarily provided by local government but which local government cannot perform because its resources have been depleted by the emergency. The statute cannot reasonably be construed to limit a state of emergency to a condition of extreme peril within the jurisdiction of a local government.

Referring to section 8588.3, CCPOA argues that the "Act's assignment of 'preparedness, mitigation, response and recovery' tasks to the Office of

Emergency Services . . . further supports [CCPOA's] point. The Act contemplates acute emergencies, i.e. those that arrive at some observable time (be it an hour or a season) and do particular harm that the State can 'mitigate,' 'respond' to and ultimately 'recover' from."[4] The argument fails because it makes no sense, and CCPOA offers no other analysis on this point. (See *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

CCPOA also asserts "the Act's listing of the *kinds of conditions* that can qualify as a State of Emergency, while not exhaustive, indicates that the Legislature meant to give state officials power over situations that would be the province of local government *but for* their 'magnitude' in the particular instance." (Original italics.) True, but this does not mean that a state of emergency cannot apply to a condition of peril on state-controlled property. To the contrary, the plain and unambiguous language of section 8558 applies to conditions of extreme peril that exist "within the state" (§ 8558, subd. (b)), not just "within the territorial limits of a county, city and county, or city" (§ 8558, subd. (c)).

CCPOA notes that "every other proclamation issued by the Governor since he took office has addressed a situation to which local governments would have responded if the harm had not been so widespread—fires, storms, etc. And each has included a list of specific 'area[s] affected' (Gov. Code, § 8625), usually by county."[5] According to CCPOA, "[t]his is strong evidence

---

[4] Section 8588.3 states: "(a) The Legislature finds and declares that it is the responsibility of the State of California to protect and preserve the right of its citizens to a safe and peaceful existence. To accomplish this goal and to minimize the destructive impact of disasters and other massive emergencies, the actions of numerous public agencies must be coordinated to effectively manage all four phases of emergency activity: preparedness, mitigation, response, and recovery. In order to ensure that the state's response to disasters or massive emergencies is effective, specialized training is necessary. [¶] (b) The California Specialized Training Institute of the office of the Adjutant General is hereby transferred to the Office of Emergency Services. The institute shall assist the Governor in providing, pursuant to subdivision (f) of Section 8570, training to state agencies, cities, and counties in their planning and preparation for disasters. [¶] (c) The Director of the Office of Emergency Services may solicit, receive, and administer funds or property from federal, state, or other public agency sources for the support and operation of the institute. [¶] (d) The Director of the Office of Emergency Services may solicit and receive firearms, other weaponry, explosive materials, chemical agents, and other items confiscated by or otherwise in the possession of law enforcement officers as donations to the institute if he or she deems them to be appropriate for the institute's training purposes. [¶] (e) Any moneys received by the Director of the Office of Emergency Services from charges or fees imposed in connection with the operation of the institute shall be deposited in the General Fund."

[5] CCPOA's request for judicial notice of other proclamations issued by the Governor is granted. (Evid. Code, §§ 459, subd. (a) ["[t]he reviewing court may take judicial notice of any matter specified in Section 452"], 452, subd. (c) [judicial notice may be taken of "[o]fficial acts of the legislative, executive, and judicial departments"].)

that even the Governor recognizes the usual and proper circumstances for the Executive's exercise of powers granted by the Act." Again, CCPOA's conclusion does not follow from the premise. The other emergency proclamations merely demonstrate that disasters or conditions of extreme peril have occurred on property within the control of political subdivisions of the state and that their magnitude justified declarations of a state of emergency. That those state of emergency proclamations addressed conditions of disaster or extreme peril occurring on property within the control of local authorities does not mean that a state of emergency proclamation must be limited to such circumstances.

Thus, we reiterate. As pertinent to this case, sections 8558 and 8625 permit the Governor to proclaim a state of emergency based on a condition in an area within the exclusive control of state government if the condition is of extreme peril to the safety of persons and property and, because of its magnitude, it is likely to affect an area within the jurisdiction of local government; is likely to be beyond the control of the services, personnel, equipment, and facilities of any single county or city; and is likely to require the combined forces of a mutual aid region or regions to combat. Whether the ability to combat the condition is likely to require the combined forces of a mutual aid region or regions will ordinarily turn on whether it is likely that local resources as well as state resources will be needed to combat the condition.

Accordingly, the Governor can proclaim a state of emergency based upon a condition occurring in a state prison. Indeed, the Emergency Services Act contains a provision specifically dealing with such an emergency. Section 8658 states: "In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section." This section and the plain and unambiguous language of sections 8558, subdivision (b) and 8625 lead to the inescapable conclusion that the trial court erred in holding that the Emergency Services Act does not apply to conditions arising in state prisons.

III

As we have noted, CCPOA did not dispute the facts asserted in the Governor's proclamation. At most, evidence submitted by CCPOA showed that overcrowding had long existed in California prisons and that it had

caused "no curtailment of prison programs, no additional training or any additional efforts to secure the safety of either inmates or CDCR staff in the weeks preceding the Proclamation."

For example, Correctional Officer Christopher Trott declared "inmate overcrowding is a major problem at Calipatria [State Prison]" but said "the problem is chronic and has not grown noticeably worse or better for many months" prior to his declaration in October 2006. Indeed, the Governor's counsel introduced evidence that on August 15, 2006, Mike Jiminez, State President of CCPOA, testified before a Senate Select Committee on Prison Population Management and Capacity that: "We at CCPOA have been continually raising issues about prison overcrowding, the severe shortages in prison staffing, the deterioration of prison facilities, and the lack of effective risk assessment for inmate evaluation. In the face of these conditions CCPOA members work hard to manage the increased tensions and dangers that are exacerbated when prisoners are double and triple bunked, when exercise yards and rehabilitation facilities are used for emergency housing and when staff shortages make inadequate inmate oversight and implementation of inmate rehabilitation programs nearly impossible. Our members already face an average of 9 assaults per day and are on the front lines of an ongoing battle keeping prison tensions from boiling over and the widespread violence that would threaten the safety of staff and inmates alike. *At the same time we are facing a crisis within the prison system. California as a whole is on the verge of a public safety disaster.*" (Italics added.)

The trial court found that the severe inmate overcrowding in state prisons "is a crisis creating conditions of extreme peril to the safety of persons and property within the state, which are or likely will be beyond the control of any single county or city in California." This satisfies two of the three criteria needed for a proclamation of emergency.

The question then is whether the conditions satisfy the third criterion, that they are "likely to . . . require the combined forces of a mutual aid region or regions to combat" (§ 8558, subd. (b)).

We conclude that the facts presented by the Governor, and uncontested by CCPOA, were sufficient to establish that the prison inmate overcrowding occurring in October 2006 was a condition of the requisite magnitude that, if not addressed, would likely require the combined forces of a mutual aid region or regions to combat, i.e., would likely require the coordination and utilization of the multiple resources of state and local government.

Among other things, the Governor showed that the state prison overcrowding crisis had already required CDCR to postpone the transfer of convicted

felons from county jails to state prisons. Consequently, the state had been relying on local government resources to temporarily house inmates who should be in state prison. This was local assistance akin to mutual aid that CDCR was likely to need to combat the prison overcrowding crisis. This fact and the Governor's showing that inmate overcrowding was occurring in prison facilities throughout the state were sufficient to establish that the problem was likely to require the assistance of the combined forces of a mutual aid region or regions to temporarily house in county jails the convicted felons whose transfers to state prison had to be delayed because of the prison overcrowding crisis. The Governor also showed that delay in transferring convicted felons from jail to prison had required at least one jail to release county prisoners before they had completed their sentences, which, it can be inferred, was likely to require local law enforcement agencies to expend resources to investigate crimes that some prisoners commit upon their release. And it could be said that the dangers posed by the magnitude of the overcrowding made it likely that CDCR would have to resort to the power authorized by section 8658 to move some prison inmates to other places of confinement or release them; which in turn would likely require the combined forces of a mutual aid region or regions to house and care for the prisoners or to address recidivist crimes that—experience has shown—are committed by some convicted felons after their early release from custody.

The Governor also stated, and CCPOA did not contest, that the state prison overcrowding crisis had substantially increased the risk of the transmission of infectious illnesses among inmates and prison staff. It logically follows that such infectious diseases would likely be transmitted to the general public either by prison staff or persons visiting prison inmates. It takes little imagination to recognize the likelihood that such a spread of infectious diseases would burden the resources of local government affected by the outbreaks, giving rise to a need for the combined forces of a mutual aid region or regions to assist persons who must resort to public health care services.

And the Governor stated, and CCPOA did not contest, that inmate overcrowding had caused prison wastewater systems to operate at or above maximum capacity, resulting in thousands of gallons of sewage spills which polluted the environment and contaminated groundwater, putting the drinking water supply and the public's health at risk. This circumstance and the fact that such severe overcrowding was occurring in prisons throughout the state were sufficient to show that it was likely the combined forces of a mutual aid region or regions would be required to combat this serious environmental contamination and threat to public health in locations around the state.

Because the three criteria necessary to proclaim a state of emergency are supported by the facts set forth in the Governor's proclamation, the Governor did not exceed his authority in issuing the proclamation, and the trial court erred in ruling otherwise.

## IV

Its substantive attacks against the Governor's proclamation having failed, CCPOA raises a procedural challenge by asserting that the proclamation is deficient because it does not contain an express finding that the emergency is likely to require the combined forces of a mutual aid region or regions to combat the emergency.

 Before a state of emergency can be proclaimed, section 8625 makes it necessary for the Governor to find that the circumstances described in subdivision (b) of section 8558 exist. But there is no language in the Emergency Services Act that requires the Governor to state each aspect of the necessary finding in the proclamation itself. Issuance of the proclamation implies the Governor has made the finding. (Evid. Code, § 664.) Therefore, it is sufficient if the proclamation sets forth circumstances that support the implied finding. (See *Martin v. Municipal Court, supra,* 148 Cal.App.3d at p. 697.)

For reasons stated in part III, *ante,* the prison overcrowding state of emergency proclamation supports the implied finding that, because of its magnitude, the condition was likely to require the combined forces of a mutual aid region or regions to combat it. Hence, CCPOA's procedural challenge to the proclamation fails.

## V

Having rejected CCPOA's attacks on Governor Schwarzenegger's prison overcrowding state of emergency proclamation, we now turn to the trial court's conclusion that when CDCR contracted with private, out-of-state facilities to house some of California's prison inmates, it violated article VII of our state Constitution (article VII), implemented by the state Civil Service Act. (§ 18500 et seq.; see *California State Employees' Assn. v. Williams* (1970) 7 Cal.App.3d 390, 395 [86 Cal.Rptr. 305].)

The Governor correctly contends the trial court erred because the contracts fall within statutory exceptions to the prohibition against contracting out services ordinarily performed by state civil service employees.

Article VII, section 1 states: "(a) The civil service includes every officer and employee of the State except as otherwise provided in this Constitution.

[¶] (b) In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination."

The purposes of article VII "are twofold: (1) to encourage efficiency and economy in state government, and (2) to eliminate the 'spoils system' of political patronage by ensuring that demonstrated fitness—rather than political considerations—spurs all appointments to public service." (*Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585, 592 [16 Cal.Rptr.2d 599].)

 "While article VII does not expressly prohibit the use of private contractors to perform state functions, judicial construction of this provision has long held that a restriction upon the use of such private contractors is necessary to fulfill its purposes. ' "Were the rule otherwise, the civil service system could be entirely undone by a system of contracting; and the state's work force could be dominated by independent contractors who would be hired from job to job." Such a system, operating without regard to considerations of economy or efficiency, and open to a "patronage/spoils system" method of contracting, would conflict with the electorate's probable intent in adopting article VII and its predecessor.' [Citations.]" (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032–1033 [56 Cal.Rptr.3d 814, 155 P.3d 226].)

Thus, courts have interpreted the civil service mandate of article VII as forbidding private contracting for services that are of a kind that persons selected through civil service could perform "adequately and competently." (*State Compensation Ins. Fund v. Riley* (1937) 9 Cal.2d 126, 135 [69 P.2d 985] (hereafter *Riley*).)

Exceptions to this rule are set forth in section 19130, which authorizes use of independent contractors to render services to the state under an enumerated set of conditions. (*People ex rel. Dept. of Fish & Game v. Attransco, Inc.* (1996) 50 Cal.App.4th 1926, 1935–1936 [58 Cal.Rptr.2d 661].)

Section 19130 states, among other things: "(b) Personal services contracting . . . shall be permissible when any of the following conditions can be met: [¶] . . . [¶] (3) The services contracted are not available within civil service, cannot be performed satisfactorily by civil service employees, or are of such a highly specialized or technical nature that the necessary expert knowledge, experience, and ability are not available through the civil service system. [¶] . . . [¶] (10) The services are of such an urgent, temporary, or occasional

nature that the delay incumbent in their implementation under civil service would frustrate their very purpose."[6]

The record shows that the exceptions set forth in section 19130, subdivision (b)(3) and (10) apply to the circumstances in this case. We begin with the latter exception.

The Governor's emergency proclamation established that the inmate overcrowding in state prisons occurring in October 2006 presented an urgent need for additional prison facilities and services. To address the emergency, the Legislature enacted the Public Safety and Offender Rehabilitation Services Act of 2007, which allocates $350 million to CDCR to design, construct, or renovate prison housing units, prison support buildings, and programming space in order to provide beds and housing for inmates who are relegated to "temporary beds" in gymnasiums, classrooms, hallways, or other public spaces that were not constructed for the purpose of housing inmates. (§ 15819.40; Stats. 2007, ch. 7, §§ 1, 28, eff. May 3, 2007.)

However, the design, construction, and renovation of additional prison housing units could not occur quickly enough to resolve the inmate population crisis. Consequently, CDCR had to resort to other services (out-of-state private prison facilities that employ their own correctional officers) to house some inmates until more space is available in prison facilities in California.

Thus, the record is sufficient to establish that the need for additional space to house prison inmates and persons to supervise those inmates pending the construction of additional inmate housing units in California prison facilities was an "urgent, temporary" need for services that "the delay incumbent in their implementation under civil service would frustrate . . . ." (§ 19130, subd. (b)(10); see *People ex rel. Dept. of Fish & Game v. Attransco, Inc., supra,* 50 Cal.App.4th at pp. 1936–1937.)

CDCR also presented evidence that due to attrition of existing correctional officer employees, difficulties in recruiting new officers, and limitations on the number of new recruits it is able to train annually, CDCR had staff shortages that will take approximately five years to fill. In other words, CDCR was unable to employ enough correctional officers to work in the additional inmate housing units needed to combat the prison overcrowding emergency. Even if CDCR could have hired and trained the requisite number of officers, the record establishes that CDCR had no additional inmate housing units in

---

[6] We grant the request of amici curiae, The GEO Group, Inc., and Corrections Corporation of America, to take judicial notice of the legislative history underlying section 19130. (*Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1137 [69 Cal.Rptr.3d 445] [the legislative history of a statute is the proper subject of judicial notice].)

which the officers could perform their services, and that state workers cannot be employed by private contractors in other states and retain their civil service status.

 Therefore, the record is sufficient to establish that the "services [for which CDCR] contracted," namely, the services of private out-of-state prisons to house CDCR inmates in order to combat CDCR's prison overcrowding emergency, were "not available within civil service" and "[could ]not be performed satisfactorily by civil service employees" (§ 19130, subd. (b)(3)). (See *Riley, supra,* 9 Cal.2d at p. 135.) Indeed, the California Supreme Court has recognized that the exception allowing contracting out for services that cannot be performed satisfactorily by civil service employees is " 'broad enough to permit contracting out where the nature of the task is such that the civil service could not perform the task . . . quickly enough," i.e., the need to contract out for services required as a result of a state of emergency or " 'personnel shortages' " falls within the exception. (*Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 567 [63 Cal.Rptr.2d 467, 936 P.2d 473].)

Relying on decisions of the State Personnel Board (the Board) interpreting section 19130, CCPOA contends that personnel shortages do not justify contracting out services because the statutory exception refers to the inability of civil service employees to adequately perform the *nature* of the services, not merely to being unavailable to perform them. (But see *Professional Engineers v. Department of Transportation, supra,* 15 Cal.4th at p. 567 [contracting out for services does not violate civil service laws " 'where the nature of the task is such that the civil service could not perform . . . quickly enough' " due to " 'personnel shortages' "].) CCPOA also argues that the urgency exception set forth in subdivision (b)(10) of section 19130 is inapplicable because the state created the urgency by "prioritizing other problems over the years."

The contentions fail because the decisions of the Board upon which CCPOA relies provide insufficient support for its argument and, in any event, the Board's interpretation of the statute is not binding on courts (see *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11–12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [courts give " 'great weight and respect' " to the Board's construction of a statute, but the " ' "final responsibility for the interpretation of the law rests with the courts" ' "]; *Capen v. Shewry* (2007) 155 Cal.App.4th 378, 390 [65 Cal.Rptr.3d 890]).

In one decision, the Board found that personnel shortages did not fall within the exception set forth in section 19130, subdivision (b)(3) because the state agency had not shown that it exhausted all reasonable avenues for

procuring the necessary services through the civil service. (*Matter of the Appeal by Department of Pesticide Regulation* (State Personnel Bd., Apr. 17, 2002, Dec. No. 01-09).) Thus, the Board was not faced with the situation where an agency resorted to using out-of-state independent contractors and their facilities because facilities in California were unavailable in which to employ civil servants. And here, unlike the situation in the cited decision, CDCR presented evidence that it will take five years to recruit and train the correctional officers needed to fill the staffing shortage. Given the state of emergency, five years is too long.

Another Board decision actually undermines CCPOA's opposition to the private prison contracts. There, the Board determined that the state prison system's inability to hire sufficient civil service nurses—even if such inability was due to the state's failure to pay salaries comparable to those in the private sector—did not preclude the application of section 19130, subdivision (b)(10)'s exception to the general prohibition against contracting out services performed by state workers. Noting that federal courts had imposed an urgent need to provide nursing services to the state's inmate population, the Board held that this urgency justified applying section 19130, subdivision (b)(10). (*Matter of the Appeal by California State Employees Association* (State Personnel Bd., Aug. 5, 2003, Dec. No. 03-02).)

Similarly, with respect to inmate overcrowding in state prison, a federal court has found that the care provided in CDCR prisons is below federal constitutional standards due in part to the lack of appropriate beds and space. (*Coleman v. Schwarzenegger* (E.D.Cal., Jul. 23, 2007, No. CIV S-90-0520 LKK JFM P [2007 U.S.Dist. Lexis 40004]; *Plata v. Schwarzenegger* (N.D.Cal., Jul. 23, 2007, No. C01-1351 TEH [2007 U.S.Dist. Lexis 56031].) The Governor has declared a valid state of emergency based on the inadequate prison facilities, finding it endangers the lives of correctional officers and inmates. What matters is not who caused the emergency, but that the emergency exists, that adequate facilities must be provided, and that they must be provided now. California cannot build or retrofit the prisons needed overnight, no matter how much money it invests to solve the problem. A period of time is required for construction, and in the interim the state must find other housing for its excess prisoners. The available facilities are out of state, are not governed by a California state agency, and are not staffed by civil service employees.

CDCR is not importing independent contractors to fill staffing shortages; it is exporting prisoners to out-of-state prisons due to a lack of facilities to safely house the prisoners within the state. Civil service employees cannot adequately perform the nature of the services because of the absence of facilities in which to perform these services. There is no evidence that the

private contracts are intended as the ultimate solution for the inmate overcrowding in CDCR facilities. The contracts are for a limited duration and permit early cancellation when prison beds become available. The Legislature has directed that prisons be built or renovated to accommodate more prison beds and has allocated $350 million for this purpose. (§ 15819.40; Stats. 2007, ch. 7, §§ 1, 28, eff. May 3, 2007.) Once the needed prisons are built, the state must staff them with civil servants; but until the prisons actually exist, there is an urgent and immediate need for services to protect the safety of California citizens, as established in the Governor's state of emergency proclamation. (See *Professional Engineers v. Department of Transportation, supra*, 15 Cal.4th at p. 567.)

For all the reasons stated above, the private contracts do not violate article VII.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to enter a new judgment denying plaintiffs the relief they seek. Plaintiffs shall reimburse defendants for their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).) The stay that we previously issued is vacated upon the finality of this decision.

Nicholson, J., and Raye, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 20, 2008, S165069.